Black *v.* Black.

CARRIE E. BLACK, by her next friend,

*v.*

CLAYTON A. BLACK.

1. A gift by a wife to her husband is good, provided it be voluntary and not the result of his craft or power.

2. When a husband receives money belonging to his wife, the law presumes he receives it for her use, and she may recover on the strength of this presumption, unless he produces proof to rebut it.

·3. A wife's money, expended by herself, or under her direction, on her husband's land, or in any other way for his use and benefit, in the absence of an agreement to repay, will be regarded as a gift.

4. A gift by a wife to her husband may be proved by circumstances.

5. Where a wife expends her money on the lands of her husband, in improving and adorning his home, equity will imply, independent of anything in the nature of a contract or promise, that she did so pursuant to an understanding that she was to be permitted to enjoy the benefits flowing from her expenditure, and if he wrongfully drives her from his house, equity will give her relief.

6. A wife must live with her husband, and make his home hers, and give him her services, unless she can show that he has done something which relieves her from her duty to him.

7. To justify a decree of separation, actual physical violence need not be proved, but it must be shown that there is reasonable ground to believe that, if the husband is allowed to retain his power over his wife, and she is compelled to remain subject to him, her life or health will be endangered.

8. Evidence must be weighed according to the means and opportu nities of knowledge of the witnesses of the facts whereof they testify.

9. A wife who causelessly deserts her husband is not entitled to the aid of a court of equity in getting possession of such chattels as she has contributed to the furnishing and adornment of her husband's house.

10. Equity will not lend its aid to the causeless disruption of family relations, or countenance unjustifiable disregard of the obligations of the marriage contract.

On final hearing, on bill, answer and proofs.

Black *v.* Black.

*Mr. S. D. Dillaye*, for complainant.

*Mr. G. S. Cannon* and *Mr. James Wilson*, for defendant.

THE VICE-CHANCELLOR.

This is a suit by a wife against her husband, to establish certain property rights. It is purely a property suit. She asks neither an absolute nor limited divorce, nor that her right to be supported shall be assured to her by the decree of this court; but simply that her legal right to certain chattels and debts, and her equitable right to be compensated for the loss of certain rights and privileges belonging to her as a wife, and of which she has been wrongfully deprived, shall be vindicated and enforced. She grounds her action on four distinct claims : First, for money expended by her in erecting buildings on the defendant's land ; second, for certain chattels belonging to her which are in her husband's possession and use, and which he refuses to surrender to her; third, for money belonging to her, which the defendant has appropriated to his own use, contrary to her will; and, fourth, for money lent by her to him. The money value of her several claims, according to her estimate, is over $35,000.

The parties were married in November, 1859, in the city of Philadelphia, where the complainant then resided with her parents, and soon thereafter she came to live with her husband, on his farm in Burlington county. They continued to live together there until the 28th day of October, 1874, when, the complainant says, "she was constrained, by her husband's outrageous conduct and long-continued ill-treatment and cruelty, culminating in infamous accusations, to leave his house and separate herself forever from him." Three children were born unto them, the eldest now being about eighteen years of age and the youngest thirteen. The complainant's father, who was a gentleman of large wealth, died in July, 1872, leaving a will by which he gave her $50,000 absolutely, and also the income for her life of over $200,000 more. By the death of defendant's father, which

Black *v.* Black.

also occurred in July, 1872, he acquired an estate which the complainant, in her bill, estimates at about $50,000. It is not disputed that the complainant, soon after the death of her father, expended of her own moneys, in rebuilding and beautifying the dwelling-house on her husband's farm and in erecting a new stable, over $20,000, and that she subsequently purchased many costly articles of household furniture and placed them in the house, and one or two carriages and other articles of luxury, and brought them upon the farm. Her expenditures, both on the buildings and for other purposes, were much more extravagant than the defendant would have made or his means warranted. She says, in her bill, she made them to furnish a home for herself, her husband and her children for life, and in her testimony she twice declares her purpose in making them was to provide a home for herself and her children. The proof shows, very clearly, that the project of rebuilding the house originated with her even before her father's death, and that she set about carrying it out soon after she came into possession of her share of his wealth. Her husband was quite content to continue to live in the old house. It was natural he should be. It was a large, substantial, well-preserved structure, quite equal, if not superior, to the best farm-houses in that part of the state; it was the place of his birth, his home, and had been the home of his father and his mother. It was natural that a man reared upon a farm, of plain tastes and thrifty habits, and with the strong attachment to the home of his youth common to our nature, should regard any project looking towards the demolition of the old house as little short of a wasteful desecration. The reconstruction of the house was undertaken by the complainant with the distinct understanding that the defendant would contribute nothing, and that she must pay the whole cost. She says it was agreed, before the work was commenced, that she was to pay for all of it, and she admits that $4,000 of the money she used she borrowed of the defendant, and the evidence shows that she returned a security, in payment of this loan,

Black *v.* Black.

after she left him. It is not pretended that her outlay was made under a promise, or even in expectation, of repayment, but, on the contrary, it clearly appears she had no such expectation or desire. She wanted to live in a house which, in its costs and luxurious appointments, should correspond with her fortune, and she obviously spent her money to gratify that desire, and without the least expectation or wish of creating a liability against her husband. Nor did he suppose, in permitting her to gratify her pride, that he was incurring a liability which might sweep away his whole inheritance.

Stripped of all mere rhetorical exaggeration or aggravation, the equity presented by the bill under the first head may be thus summarized: The complainant, believing that her husband would treat her, during their joint lives, with the kindness and affection which a faithful wife has a right to receive from her husband, has expended a large sum of money on her husband's land, with his approbation, in making a beautiful and attractive home for their joint occupation and enjoyment; but he, after securing the benefit of her large outlay, has, in flagrant violation of her conjugal rights, by cruel and brutal treatment, driven her from his house and compelled her to seek safety by separating herself from him, and has thus wantonly deprived her of all the pleasure and happiness which she made her outlay to secure. It is clear, I think, so long as she continued to live with her husband and to participate in the enjoyment of the luxury and splendor her wealth had brought about them, she was not in a position to set up any claim against him. She was then receiving all she desired to gain by her outlay. She gave her money to purchase a home, not for herself alone, but for her husband and her children, and while she continued a member of his family, and received the consideration due to her as a wife and a mother, she was in the full enjoyment of the full measure of her rights. Neither in justice or morals could she ask anything more. Her expenditures were a gift to her husband. She voluntarily incorporated

her property into his, so that hers lost its distinctive charac-
ter and individuality, and became an indissoluble part of
his. She sunk or merged hers into his, and thereby made
it his. Her purpose is seen in her acts, and they speak as
plainly and as forcibly as any words she could have spoken
or written.

There can be no doubt that a wife may give a part, or the
whole, of her separate estate to her husband, and thus invest
him with a perfect title, but the courts, in consequence of
his great influence over her, always look upon such transac-
tions with watchfulness, and require the husband, when he
sets up a title founded on a gift from his wife, to show, by
full proof, that her act was free and voluntary, and not, the
result of his craft or power. *Clancy on Mar. Wom.* 347.

When a husband receives money belonging to his wife,
the law presumes he receives it for her use, and if he denies
that he is liable, the mere fact that he received it casts upon
him the burden of showing that he has appropriated it
according to her direction, or that she gave it to him. This
is the rule in respect to the *corpus* or principal; a different
rule prevails as to interest or income. If he receives inter-
est or income and spends it with her knowledge and without
objection, a gift will be presumed from her acquiescence.
*Horner* v. *Webster*, 4 *Vr.* 406; *Hurney* v. *Phillips*, 50 *Pa. St.*
328; *Clancy on Mar. Wom.* 352. Money received by a hus-
band from his wife, and expended by him, under her direction,
on his land, in improving the home of the family, cannot be
recovered by the wife. Her direction to expend it on his
property constitutes a gift to him, and cuts off all right,
either legal or equitable, to reclaim the money or demand
an account. *Johnston* v. *Johnston's Adm'r*, 31 *Pa. St.* 450.
An appropriation by a wife, herself, of her separate property
to the use and benefit of her husband, in the absence of an
agreement to repay, or any circumstances from which such
an agreement can be inferred, will not create the relation of
debtor and creditor nor render the husband liable to account.
*Edelin* v. *Edelin*, 11 *Md.* 420. Though no words of gift be

spoken, a gift by a wife to her husband may be shown by the very nature of the transaction, or appear from the attend-ing circumstances. *Hanford* v. *Bockee*, 5 *C. E. Gr.* 106. If a wife should voluntarily accept a bond, payable to her husband, for her share of her father's estate, and then pass it to him, though she did not utter a word indicating her purpose, the circumstances would most unequivocally show a gift. *Vreeland* v. *Vreeland's Adm'r*, 1 *C. E. Gr.* 521. The court will not, in transactions between husband and wife, infer an equitable *assumpsit* contrary to their manifest under-standing. *Clinton* v. *Hooper*, 1 *Ves.* 188.

But a decision which regards the complainant's expendi-tures as a gift, does not, in my judgment, settle the question of the defendant's liability. They were made with his con-sent; he could have prevented their being made if he had willed to do so. He knew the motives and purposes which controlled the complainant, and what were her hopes and expectations. His house was her home; she had a right to dwell there and make it the scene of her greatest usefulness, honor and happiness. He knew that her object was to make his home beautiful and attractive for their joint enjoyment, and he accepted her gift on a well-understood condition that he would accord to her the full measure of her rights and privileges as his wife. The intimacy and union of their relation would necessarily give rise to such an understand-ing. She had a right to believe, independent of anything in the nature of a contract or promise, that she would always be permitted freely to enjoy with him all the benefits flowing from any expenditure she made to increase the comfort and luxury of his home. He has no right to defeat or disappoint these expectations; and hence, if it be true that he has causelessly driven her from his house and compelled her to seek safety in flight, I think his conduct exhibits a case of grievous wrong which calls loudly for redress, and which this court, in the exercise of its undoubted power, is bound to give.

The question, then, presented by this branch of the case, is this: Was the complainant justified in separating herself from her husband? The justification she offers is cruelty. She must show a case of extreme cruelty such as would entitle her to a decree of separation. The courts can know no middle ground—a wife must live with her husband, make his home hers, and give him her society and services, unless she can show reasons, valid in law, relieving her from her duty to him. To justify a divorce *a mensa et thoro*, actual physical violence need not be proved, but such conduct, by the husband, must be shown as will justify the court in believing that, if he is allowed to retain his power over his wife and she is compelled to remain subject to him, her life or her health will be endangered, or that he will render her life one of such extreme discomfort and wretchedness as to incapacitate her to discharge the duties of a wife. *Close* v. *Close*, 10 *C. E. Gr.* 529; *English* v. *English*, 12 *C. E. Gr.* 585. Slight violence by a husband who has evinced a hatred, almost diabolical, against his wife, in attempting to blast her reputation by fabricating a charge of adultery against her, has been deemed sufficient. *Graecen* v. *Graecen*, 1 *Gr. Ch.* 459; *Thomas* v. *Thomas*, 5 *C. E. Gr.* 97. Any husband whose sense of decency and justice is so completely destroyed as to be able, deliberately, to set on foot a scheme to fasten upon his wife a false charge of adultery, is, in my estimation, capable of doing anything a cruel heart can desire or a brutal mind invent, and any woman whose life must be spent in the seclusion of his home, and whose person is subject to his power, occupies a position of such constant and extreme danger as to have a right to the protection of the law whenever she demands it.

The proof in support of the charge of cruelty, comes from the mouth of the complainant alone, and is of the most meagre character. She says she left because her husband abused and ill-treated her; that his ill-treatment generally consisted in the use of coarse and profane language, and that on two occasions he struck her. The blows are

Black *v.* Black.

strongly denied by the · defendant.  A person whom the complainant says was present when one of them was given, and saw it, swears that he saw nothing of the kind, and that, although he was frequently with the complainant, and conversed with her familiarly, she never uttered a word of complaint against her husband.  On the part of the defendant, the servants of the family and several persons who lived on terms of social intimacy with these unfortunate people, have been examined, and they uniformly testify that they never saw anything approaching cruelty, or even unkindness, in the conduct of the defendant towards the complainant, and, with a single exception, they also say they never heard her make any complaint against her husband. The family physician, however, says it was quite a common thing for the complainant to complain of her husband; that she never made any distinct charge against him, except that he used abusive language, but what it was, or why she denominated it abusive, she did not explain.  The defendant admits that he has frequently expostulated with her, in very strong terms, against what he thought were gross improprieties of conduct.  Whether what he said by way of remonstrance she esteemed abusive, or he actually hurled at her vile epithets, which she could not hear from his lips without believing that his heart was turned against her, or he merely reproved her, with becoming gentleness, for some frivolous fault, her testimony neither tells nor shows.  As the case now stands, her judgment as to what constitutes cruelty by the use of abusive language, must be accepted as conclusive, or the charge of cruelty, so far as it rests upon her evidence, must be held not proved.  It is needless to say, her judgment cannot be accepted.

But the most weighty evidence on this point, in the opinion of the counsel of the complainant, remains to be considered.  It is a letter, alleged to have been written by the defendant to his wife, and sent to one of her male acquaintances, and by him given to the complainant.  It is not necessary to state its contents.  It is enough to say it is

revoltingly obscene, and could only have proceeded from a very corrupt and filthy mind. Nothing proceeding from the heart of a husband, simply in the form of words, could be more cruelly brutal to a refined and virtuous wife. If the defendant wrote it, and the complainant left him in consequence of the wounds and anguish it produced, I am not prepared to say she was not fully justified. But it is certain she did not. She did not leave under sudden provocation, but pursuant to a purpose long cherished and frequently expressed. She does not pretend that the letter provoked the separation; in fact, it is quite certain that, at the time she left him, she had neither seen nor heard of it. Neither before, nor at the time she left, did she ever speak of the letter to the defendant, or to any other person, and on the morning when she left she asked the defendant to kiss her, and permitted him to do so. If she was not wholly insensible to emotions of scorn and indignation, she would never have submitted to the indignity of a kiss from the man whom she believed guilty of such an unmanly attempt to insult and humiliate her. Nor do I believe the defendant wrote the letter. He swears he did not. The stigma of its authorship should not be fastened upon him, except upon full proof such as produces clear conviction. There is nothing in his life or conduct, as portrayed by the evidence, which will for one moment justify a suspicion that he was capable of so dastardly an outrage upon any woman, much less can it be believed that he would commit it upon the woman who is the mother of his children, and whose name is inseparably linked with his. Five experts, after careful comparison of the letter whose authorship is on trial, with writings admitted to have been written by the defendant, have pronounced opinions against the defendant. They had no previous knowledge of his handwriting. Two persons well acquainted with his handwriting have expressed opposite opinions, while the complainant, who is, of course, very familiar with his handwriting, says she believes he wrote it. There is, unquestionably, a strong resemblance, both in

general appearance and in certain individual characteristics, between the true and the disputed writings, but this is true of every well-executed counterfeit. The opinion of experts, based on comparison alone, is evidence of low degree, and has been regarded by eminent judges much too uncertain, even when only slightly opposed, to afford a safe foundation for a judicial decision. *Gurney* v. *Langlands,* 5 *Barn. & Ald.* 185; *Doe* v. *Suckermore,* 5 *Ad. & El.* 751; 1 *Greenl. Ev.* § 580, *note* (2); *Stark. Ev.* 173, *note* (e). Evidence must be weighed according to the means and opportunities of knowledge of the witnesses of the facts whereof they testify. When the defendant swears he did not write this letter, he speaks concerning a fact of which his knowledge is more perfect than that of any other witness, or of all the others. If his bearing in this case has been that of an honest witness, and his testimony as a whole seems to be reasonable, probable and truthful, and if, notwithstanding the strong bias of his deep interest, he has appeared willing to tell the whole truth, whether it helped or hurt him, his evidence must, in virtue of its intrinsic force, outweigh any amount of counter-proof consisting of opinion merely. I think his evidence is entitled to that degree of weight in· this case. In my judgment, the complainant's separation from her husband was causeless; it was in fact a wrongful desertion. She must therefore be held to have voluntarily and causelessly deprived herself of the rights and privileges for which she is now seeking compensation. Her first claim must therefore be denied.

This conclusion practically disposes of her second claim. She asks a decree compelling her husband to surrender into her possession certain chattels which she has contributed to the general stock used at his home for the use and enjoyment of the family, because he has wrongfully driven her from his home. A case thus made up, combining strict legal right with an unconscionable violation of conjugal duty, would undoubtedly give an indisputable right to redress. But she has no such case; she is the person who is in the wrong,

who has been unfaithful to conjugal duty, and upon whose head rests the shame of destroying a home.   Her case stands on her legal right alone.   She has that, but it is all.

In my view the defendant has failed to show a title by gift. It has already been decided in this very case (11 *C. E. Gr.* 296) that a bare legal right, existing in the hands of a faithless wife, who has causelessly deserted her husband, is not sufficient to induce this court to put its power in motion to help her.   The answer originally filed in this case did not deny the averments of the bill as to the complainant's title to a part of the chattels now claimed, and thereupon a motion was made on her behalf for an order directing their surrender.   In deciding that application the chancellor said : " This motion must necessarily be based on the broad ground that a married woman is, without regard to circumstances, entitled to the aid of equity to obtain possession of her property when it is withheld from her by her husband ; and, further, that if she chooses to abandon her husband's house, though she may be actuated by caprice merely, or even by a worse motive, she has, by virtue of her legal right alone, a claim upon a court of equity to its aid in obtaining possession of that property, even though it be household furniture which, up to the time of her departure, was in the joint use of her husband and herself in their household, and is still in his possession, in the use of the family.   A decent regard for the interests of society would forbid the court from entertaining such a proposition.   Equity will not lend its aid to the causeless disruption of family relations, or countenance the unjustifiable disregard of the obligations of the marriage contract.   They, therefore, who come into this court for relief in such cases, must not only come with clean hands, but must show a reason valid in conscience, as well as a legal right, for the assistance which they seek."   These views command my hearty assent.   They rest on obvious considerations of justice and· sound policy.   It was long ago declared that a wife who deserts her husband to enjoy the society of her paramour, would, on account of her miscon-

duct, be refused the aid of a court of equity against her husband, in respect to her separate estate, which, under other circumstances, she would have a right to claim. *Lee* v. *Lee*, 2 *Dick.* 806; *Clancy on Mar. Wom.* 354. If the complainant's legal right is sufficient, notwithstanding her desertion, to entitle her to the aid of this court, she would, in legal theory at least, upon the same ground, be entitled to the same aid, even if she was living in a state of open adultery.

In refusing to aid the complainant, no question of legal right is determined. On the contrary, her legal right is admitted. She may, perhaps, have such complete dominion over the chattels in controversy as to be able to invest her vendee with a title which her husband cannot successfully resist in a court of law. *Houston* v. *Clark*, 50 *N. H.* 482; *Jones* v. *Jones*, 19 *Iowa* 242. But she is repulsed simply because her desire to sue, if not her right of action, flows directly from her own wrongful act. She wants her husband to give up the property which she has contributed to their home, because she has deserted him. Because she has taken herself away, she wants to take her property also. Her suit is the sequence of her desertion; if there had been no desertion, there would have been no suit. She asks the court to help in her wrong. Such a suitor, with such a case, has no right, in my judgment, to the aid of this court.

The third claim, which is a demand for money alleged to have been wrongfully appropriated by her husband, stands on an entirely different footing. If it is true that he has appropriated to his own use moneys which she gave him to deposit in bank to her credit, or if he has refused to pay over to her moneys which he has received for her use, she is entitled to relief. She never consented that he should have the use or enjoyment of such moneys, and, if he has kept them, or used them contrary to her express direction, his conduct was both inequitable and dishonest. But the evidence totally fails to establish the truth of this claim; in truth, it has so scanty a support in the proofs that, in the very elaborate and zealous argument pressed upon my

Black *v.* Black.

attention by the counsel of the complainant, it received only a very curt and *nonchalant* mention.

The remaining claim, that for borrowed money, I think must be sustained. It is evidenced by three promissory notes. The defence interposed to it is, in my view, without substance or merit. The defendant admits that he borrowed the money, and that he has not paid it, but says, about two weeks before the complainant left him, she and he had a settlement; that, on its conclusion, she asked him for $30, which he refused to give her; that she then said he would not be bothered with her much longer; that he then said that he wanted her to remember she had certain obligations of his, to which she replied at once, she would return them to him; and that thereupon he wrote, on an old letter envelope, a receipt or release whereby she renounced and gave up all claims she held against him, and requested her to sign it. She at first refused, saying she had not time (she was ready to go to the depot to take a train), but, upon his repeating his request, saying he would like her to sign it, she stepped to the table and signed it.

So far as the evidence gives us any light, her act was without reason or motive, a mere rash or foolish freak; she had already finally determined to leave her husband, and he knew it; there had been no previous talk or negotiation upon the subject, nor, so far as appears, had she ever thought of it before. All we know is, that he reminds her that she holds certain obligations against him; she at once says she will return them, and, without giving her the slightest opportunity to retreat, or even to get a clear comprehension of her act, he attempts to fasten her by a very broad, written surrender. His urgency and her precipitancy, and the utter absence of anything like a sensible motive or a reasonable consideration for her act, I think must leave it, in judicial estimation, without the slightest force or efficacy. The complainant is entitled to a decree for the amount due on the three notes given by the defendant to her.

A decree in conformity with the foregoing views will be advised. Neither party is entitled to costs. When the character of the complainant's claims, and the motives which prompted her to prefer them by suit, are considered, it is obvious that she is in no plight to ask to be indemnified against the costs of the litigation.