BAIRD, RESPONDENT, *v.* BAIRD, APPELLANT.

No. 9023.

Submitted March 8, 1951. Decided June 7, 1951.

232 Pac. (2d) 348.

Mr. Dalton T. Pierson, Messrs. Smith, Boone & Rimel, and Mr. Russell E. Smith, all of Missoula, for appellant.

Messrs. Jewell & Root, and Messrs. Shallenberger & Paddock, and Mr. William F. Shallenberger, all of Missoula, for respondent.

Mr. Smith and Mr. Shallenberger argued orally.

MR. CHIEF JUSTICE ADAIR:

Suit in equity seeking restitution for advancements made by one spouse to the other.

Mrs. Emma Ryberg, 41, an unattached widow, boarded a passenger coach at Yakima, Washington, at about 4:00 o'clock on the morning of December 10, 1947, enroute to her home at Bismarck, North Dakota. She first seated herself beside a man occupying a seat immediately behind one wherein sat Harold Baird, 37, single, who was enroute from Seattle to his home in Missoula. After a while the passenger with whom Mrs. Ryberg was sitting went out of the coach whereupon Mrs. Ryberg struck up a conversation with Baird, moved into his seat and visited with him until he arrived at his destination. At Mis-

soula, Baird left the train. Mrs. Ryberg continued on to Bismarck.

At Christmas Baird sent Mrs. Ryberg a Christmas card.

On January 3, 1948, Mrs. Ryberg called Baird by long distance telephone and informed him that she was returning to the west coast via Missoula.

On January 16, Mrs. Ryberg arrived in Missoula where she remained for three or four days, staying at a hotel, attending shows with Baird and meeting and visiting with his mother and other relatives.

Baird, a veteran of World War II, with the aid of a G. I. loan, had built a small four-room home at 118 Beverly street in Missoula, doing all the carpenter work and labor thereon himself and there he and his mother were residing at the time of Mrs. Ryberg's January visit. Following such visit Mrs. Ryberg proceeded to the states of Washington, Oregon and California where she visited relatives during which time she frequently called and talked with Baird over the long distance telephone.

In February 1948, Mrs. Ryberg returned to Missoula for a second visit at which time she proposed that Baird go with her to Salem, Oregon, for a Chevrolet automobile which she had left with certain of her relatives stating she did not care to have them longer use the machine. On February 21st the two went for the car and on the following day Baird, accompanied by Mrs. Ryberg, drove it from Salem to Missoula where it was left by Mrs. Ryberg who returned to her home in Bismarck by train to settle the estate of her recently deceased husband. From there Mrs. Ryberg called Baird by long distance telephone on an average of once a week.

In May 1948, during one of such telephone conversations, Mrs. Ryberg learned that Baird had planned a fishing trip for May 23rd, the opening day of the fishing season. Both Mrs. Ryberg and Baird were ardent anglers and when Mrs. Ryberg expressed a desire to accompany him on the fishing trip Baird consented. On May 22nd, Mrs. Ryberg arrived from Bismarck

by airplane bringing with her a watch purchased in North Dakota which she presented to Baird as a gift. On May 25th, Mrs. Ryberg returned to her home in Bismarck where she remained but a couple of weeks when she came to Missoula again, moving into Baird's home at 118 Beverly street where, for the ensuing three months she resided and made her home with Baird and his mother.

On June 10, 1948, Mrs. Ryberg opened a personal savings account in the First National Bank of Missoula in the name of "Emma Ryberg Baird" depositing therein checks totalling $11,-000. Also on the same date and in the same bank she opened an individual checking account in the name of "Emma Ryberg Baird" wherein she transferred $3,000 from her aforesaid savings account. At the time of opening the accounts, Mrs. Ryberg told the officers at the bank that she had come to Missoula to get married and for that reason she desired her accounts placed and carried in the above form.

On September 21, 1948, being over three months later, Mrs. Ryberg and Baird obtained a marriage license at Superior, Montana, and that day were there married by a justice of the peace.

At and for a long time prior to the marriage Mrs. Ryberg knew that Baird's home at 118 Beverly street stood in his name; that it was encumbered by a mortgage which he had executed to secure a G. I. loan of $5,500; that Baird was employed by the United States Postal Department at Missoula; that his take-home salary was slightly in excess of $3,000 per year and that such salary constituted his only source of income. Prior to their marriage, Mrs. Ryberg had informed Baird that she owned considerable property standing in her name and consisting of cash, government bonds, a home in Bismarck, North Dakota, and other property there situate.

On September 14, 1948, being the week preceding their marriage, the couple opened a joint checking account in the Missoula bank wherein Baird thereafter made a series of deposits with money received from his salary warrants. Also in Septem-

ber Mrs. Ryberg delivered to the bank certain government bonds accompanied by her application to the treasury department requesting the reissuance of the bonds so as to make them payable to herself or Baird as co-owners. Upon their reissuance and return the bonds were deposited in a joint safety deposit box which the couple had rented from the bank and to which each had access.

Following their marriage Emma Ryberg· Baird urged her husband to pay off his G. I. loan and on November 3, 1948, she voluntarily withdrew $5,500 from her individual savings account and deposited such sum in the couple's joint checking account to enable her husband to pay and wipe out his G. I. loan.

On the following day, November 4, 1948, with the knowledge and consent of his wife, Baird paid his debt in full with a check drawn by him on the joint checking account receiving in return a release and satisfaction of the mortgage which he had given to secure the repayment of the loan.

In December 1948, Emma Baird decided to either sell or trade in her Chevrolet on a new car and on January 27, 1949, Baird, with the knowledge and consent of his wife, placed an order for a new Pontiac automobile making a $200 deposit thereon with a check drawn by him on the joint checking account.

On March 10, 1949, the new Pontiac arrived and Baird, with the knowledge and consent of his wife, accepted delivery paying the balance due on the purchase price with funds obtained from the sale of some of the jointly held government bonds. Following the purchase of the new car the wife sold her Chevrolet for $1,050 and invested the entire proceeds in government bonds.

In April 1949, a small fishing boat and an outboard motor were purchased and paid for by a check drawn by Baird on the joint checking account. Thereafter the boat and motor were much used by Baird and his wife on the numerous fishing trips which they shared together that spring and summer.

Subsequent to her marriage, Emma Baird gave away many presents including a new coat and two suits to one woman,—a costly dress to another,—two guns to her husband, and to vari-

ous other persons she delivered various and sundry articles which, according to her version were merely "stored" with such persons but which, according to Baird, were delivered to them as gifts.

On September 9, 1949, Emma Baird, of her own volition, quit her husband and moved out of the family domicile telling Baird that she was through with him. Upon leaving the family home she took with her all her wearing apparel and personal effects as well as many articles for which she had no immediate need including the lawn mower, a two-wheel auto trailer, a canvas tarpaulin, a washing machine, wedding presents as well as a $79 platform rocker and various dishes and rugs.

This turn of events brought to a sudden end the sharing with her husband of the fishing excursions, the home, the new Pontiac car, the boat and outboard motor, and on September 10, 1949, being the day after she left him, Emma Baird commenced this suit in equity against her husband seeking a decree of the court ordering the sale, at public auction, of the husband's dwelling at 118 Beverly street, the Pontiac car, the fishing boat and motor and further ordering that the proceeds of such sales be impressed with a trust in her favor in the amount of $8,913.50, for advancements claimed to have been made to her husband *after* their marriage, the complaint alleging that such advancements were procured by reason of false and fraudulent representations made during the couple's courtship and *prior* to their marriage.

The husband appeared and defended. A trial of the issues before the court sitting without a jury resulted in findings of fact, conclusions of law and decree for plaintiff. From the decree so entered defendant has appealed assigning as error the denial of his general demurrer to the complaint, the making of the trial court's findings and conclusions and the rendering and entering of the decree against him.

Defendant appeared by motion to strike designated portions of the complaint which motion was allowed in part. Next defendant interposed a general demurrer to the complaint and

upon the overruling thereof he answered admitting certain averments of the complaint and denying others including those accusing him of making false or fraudulent representations.

The representations whereof plaintiff complains are pleaded in the third paragraph of her complaint which reads: "III. That *prior* to said intermarriage and *for the purpose of inducing plaintiff to consent to said marriage,* the defendant falsely and fraudulently represented to her *that he was an honest, honorable man, that he loved her and wanted her to be his wife, that he wanted to make a home for her and lead a happy, normal married life,* and concealed from her his real character. That the plaintiff believed and relied upon said representations and was thereby induced to consent to said marriage; that at the time of said marriage, she believed that said representations and each of them was true; *that plaintiff would not have consented to said marriage,* had said representations not been made to her and the said concealment had not been practiced upon her." (Emphasis supplied.)

The representations so pleaded are mere conclusions of the ▮ pleader tendering no issue and wholly insufficient to plead either a void or voidable marriage. The record shows that the marriage was fully consummated. Following its performance the husband and wife had constantly consorted under one and the same roof for a year, lacking eleven days, immediately preceding the commencement of this suit. The record shows the wife to be an intelligent mature woman possessed of all her faculties, and considerable wealth with long previous experience in both matrimony and business. The general representations pleaded and upon which plaintiff relies, fall far short of being such as would either vitiate the marriage or entail liability on the part of her spouse. Such representations do not go to the essence of the marriage contract nor do they constitute actionable fraud.

It is only actionable fraud against which a court of equity ▮ has jurisdiction to relieve. Such fraud is never presumed. It must be pleaded and it must be proved.

In Longtin v. Longtin, Sup., 22 N. Y. S. (2d) 827, 830, the court said: ''Assuming that the complaint alleged much more clearly than it does that defendant had repeatedly and unmistakably promised to love and cherish the plaintiff and that she had never in fact had any such intention, such allegations and adequate proof in support thereof would not entitle plaintiff to an annulment of his marriage on the ground of fraud, even though he might well claim that he relied upon such promises and would not have married defendant if they had not been made. Such fraud does not go to the essentials of the marriage. [Citing cases.] It must follow, therefore, that the allegations of the complaint in this regard do not state facts sufficient to constitute a cause of action in fraud. * * * Courts have never annulled a marriage because of a mere change of mind or for a misrepresentation of a mental state.''

The contract of marriage forms the gateway to the status of marriage. In entering into such contract and assuming such status, ''the parties take each other for better, for worse, for richer, for poorer, to cherish each other in sickness and in health; consequently a mistake, whether resulting from accident, or indeed generally from fraudulent practices, in respect to the character, fortune, health, or the like, does not render void what is done. * * and Lord Stowell * * * adds: 'A man who means to act upon such representations should verify them by his own inquiries. The law presumes that he uses due caution in a matter in which his happiness for life is so materially involved, and it makes no provision for the relief of a blind credulity, however it may have been produced.' * * * If the man should in words agree with the woman to be her husband only on condition of her proving so rich, so virtuous, so wise, so healthy, of such a standing in society; yet, .if he afterward celebrates the nuptials on her representing herself to possess the stipulated qualities, while in truth she is destitute of them; still, in such celebration, he says to her in effect and in law, 'I take you to be my wife, whether you have the qualities or not, whether you have deceived me or not.' In other words, he

waives the condition. To carry such a condition into the marital relation would violate its spirit and purpose, and be contrary to good morals. The objects of marriage, rightly understood, transcend all considerations of the kind mentioned; and, if the purchaser of a jewel could not annul the bargain by reason of the seller sending it to him in a plain envelope of paper, instead of a figured one, as was contemplated,—surely the husband should not be permitted to repudiate his marriage, though he should discover an absence of some secondary thing, to which he had given his affections, instead of placing them where he had promised." 1 Bishop on Marriage and Divorce (5th Ed.), secs. 167, 168, pp. 143, 144.

In Lewis v. Lewis, 44 Minn. 124, 126, 46 N. W. 323, 9 L. R. A. 505, 20 Am. St. Rep. 559, the court, recognizing that concealment or deception by one of the parties in respect to traits of character, temper, reputation, and the like, is not sufficient ground for avoiding a marriage, said: "The parties must take the burden of informing themselves, by acquaintance and satisfactory inquiry, before entering into a contract of the first importance to themselves and to society in general."

In Schaeffer v. Schaeffer, 160 App. Div. 48, 144 N. Y. S. 774, the court said that "we have not yet arrived at a legal stage which requires an annulment of a marriage because one party or both parties were untruthful to each other in their mutual protestations of all-consuming and undying love. Marriage is yet a status, on which depends the idea of a family, and on which in turn has arisen the structure of civilization as we know it."

In 1 Schouler, Marriage, Divorce, Separation and Domestic Relations (6th Ed.), sec. 23, at p. 36, it is said: "The marriage relation is not to be disturbed for trifles, nor can the cumbrous machinery of the courts be brought to bear upon impalpable things. The law, it has been well observed, makes no provision for the relief of a blind credulity, however it may have been produced. Fraudulent misrepresentations of one party as to birth, social position, fortune, good health, and temperament,

cannot therefore vitiate the contract. *Caveat emptor* is the harsh but necessary maxim of the law. Love, however indispensable in an aesthetic sense, is by no means a legal essential to marriage; simply because it cannot be weighed in the scales of justice. So, too, all such matters are peculiarly within the knowledge of the parties themselves, and they are put upon reasonable inquiry."

In Long v. Long, 77 N. C. 304, 307, 24 Am. Rep. 449, the court quoted with approval from the early case of Scroggins v. Scroggins, 14 N. C. 535, 3 Dev. 535, as follows: " 'There is, in general, no safe rule but this: That persons who marry agree to take each other *as they are* * * And we cannot but say, that nothing could be more dangerous than to allow those who have agreed to take each other in terms *for better, for worse,* to be permitted to say that one of the parties is worse than expected.' "

Courts must recognize, as did the Immortal Bard, that, "All lovers swear more performance than they are able, and yet reserve an ability that they never perform; vowing more than the perfection of ten, and discharging less than the tenth part of one." During courtship lovers of both sexes are apt to set their best foot forward and resort to display, self praise, pushing, puffery and even flattery all of which fall within the category of "the showman's privilege" rather than within the realm of actionable fraud. *Simplex commendatio non nocet.* Self praise is no recommendation. For that reason it is no representation and nobody trusts to it. By it no one is deceived.

Error is specified in the making of the trial court's finding and conclusion to the effect "that all the allegations of the plaintiff's complaint are true."

In her verified complaint the plaintiff swore: "That the defendant procured the $5,500 above referred to from plaintiff in the month of November, 1948, and applied the $5,500 *on the purchase of a dwelling house, placing the title of said dwelling in his own name to the exclusion of the plaintiff and against her wishes."* (Emphasis supplied.)

The quoted allegations of the complaint are not true. On the

▮ contrary they are false and contrary to the undisputed evidence submitted at the trial. The money was not advanced "on the purchase of a dwelling house" nor was it used by defendant for "placing the title of said dwelling in his own name." Such wholly unfounded allegations were inserted in plaintiff's complaint for the obvious purpose of bringing it within the provisions of R. C. M. 1947, section 86-103, in order to withstand the challenge that it fails to state facts sufficient to constitute a cause of action. This can avail plaintiff nothing for she did not and could not prove her false allegations and she could not establish a case for relief under section 86-103, supra.

The uncontroverted evidence is: That the defendant Harold Baird had acquired and that he owned the fee simple title to the described real property long before he ever became acquainted with plaintiff; that on April 10, 1946, at the time he made written application for a preference rating and a G. I. loan the fee simple title to the property was vested in Baird; that at all times since he has owned and held such fee simple title; that his wife voluntarily made the advancement to him for the express purpose of enabling him to pay his debt and that he used it for that specific purpose.

*Payment of Husband's Debt.* There is no evidence that prior ▮ to or at the time the money was advanced to pay the husband's debt, there was any promise, agreement or understanding that he would repay any part of the sum or that he promised or agreed to convey title to any part of his property to his wife or that any condition whatever was imposed other than that the money was to be used to pay the husband's debt.

The wife testified that *after* she had deposited the money in the joint checking account and *after* her husband had paid the mortgage debt in full, *then and not until then* did she want an interest in her husband's real property. She testified: "Q. But you did urge him to pay up that mortgage on the house? A. Yes, but I wanted my name on it *after* I spent my money to pay it up."

As was said in Pieretti v. Seigling, 134 N. J. Eq. 105, 106,

34 A. (2d) 286, 287: "But her money was used at her desire for this particular purpose. 'An appropriation by a wife, herself, of her separate property to the use and benefit of her husband, in the absence of an agreement to repay, or any circumstances from which such an agreement can be inferred, will not create the relation of debtor and creditor nor render the husband liable to account.' Black v. Black, 30 N. J. Eq. 215. And no trust in the land results. Vigne v. Vigne, 98 N. J. Eq. 274, 130 A. 816.''

The transaction was a gift by plaintiff to her husband. R. C. M. 1947, secs. 67-1706, 67-1708; State ex rel. Board of Equalization v. Cole, 122 Mont. 9, 195 Pac. (2d) 989; Pieretti v. Seigling, supra; In re Harris' Estate, 9 Cal. (2d) 649, 72 Pac. (2d) 873; In re Estate of Lissner, 27 Cal. App. (2d) 570, 81 Pac. (2d) 448.

One spouse may not make a gift of property to the other ▇▇ and thereafter continue to be the equitable owner of such property. Lewis v. Bowman, 113 Mont. 68, 121 Pac. (2d) 162; Shaw v. Shaw, 122 Mont. 593, 208 Pac. (2d) 514.

In Montana a wife may transfer her separate property, real or personal, R. C. M. 1947, sec. 36-111, and she may make contracts, oral or written with the like effect as if she were a single woman. R. C. M. 1947, sec. 36-130. She has the right to give her property away. She may give it to her husband or to any other person.

"A married woman has a right to apply her property, by her own hand or through her husband, directly to the payment of his debts. Also the wife has a right to contribute her money to the improvement of the home of the husband and herself. Where there is a valid and completed gift from the wife to the husband, it is immaterial for what purposes the husband subsequently uses the money or property which was the subject of the gift. The husband cannot be compelled to return the money or property given nor can the wife reclaim or recover it.'' 30 C. J., Husband and Wife, sec. 303, p. 707, notes 4-7. Also see 41 C. J. S., Husband and Wife, sec. 156, page 636, n. 6.

"A person who officiously confers a benefit upon another is not entitled to restitution therefor." Restatement of Restitution, sec. 2, p. 15.

It is the rule in this jurisdiction that a transfer of title to ▇ property from one spouse to the other is presumed to be a gift, Kranjcec v. Belinak, 114 Mont. 26, 34, 132 Pac. (2d) 150; Bingham v. National Bank of Montana, 105 Mont. 159, 166, 72 Pac. (2d) 90, 113 A. L. R. 315; Lewis v. Lewis, 109 Mont. 42, 49, 94 Pac. (2d) 211; Lewis v. Bowman, supra; Humbird v. Arnet, 99 Mont. 499, 509, 44 Pac. (2d) 756, and that an advance of money made by one spouse to the other is a gift, a gratuity; no contractual relationship is presumed and no obligation arises therefrom. Bast v. Bast, 68 Mont. 69, 76, 217 Pac. 345; Shaw v. Shaw, supra.

While the presumption that the transaction was a gift may ▇ be rebutted by competent evidence, yet to overcome such presumption the evidence must be clear, convincing and practically free from doubt, Lewis v. Bowman, supra; Clary v. Fleming, 60 Mont. 246, 252, 198 Pac. 546, and such presumption is not overcome as a matter of law merely by the positive testimony of an interested witness to the contrary. McLaughlin v. Corcoran, 104 Mont. 590, 597, 69 Pac. (2d) 597; Lewis v. Bowman, supra.

*Purchase of Boat and Motor.* As to the purchase of the small fishing boat and outboard motor, the defendant Harold Baird testified:

"Well, she suggested buying that boat and motor because she wanted us to be by ourselves. I told her that I could borrow that boat anytime I wanted to so I didn't see any reason why we had to buy a boat. Well, she insisted that we buy one so I looked around for some prices and wrote for some information about the prices of good boats. I finally found this boat that was priced at $113.00, C.O.D., and then we bought this motor that came to $125.00.

"Q. Then that boat and motor was bought upon her request and urgency? A. Yes, it was.

"Q. And that was against your better judgment? A. That's right.

"Q. And that boat and motor was paid for out of the joint checking account? A. Yes."

The plaintiff Emma Ryberg Baird testified:

"Q. Who furnished the boat for this fishing trip? A. I did so that we could be alone once in a while.

"Q. And the motor too? A. Yes.

"Q. So that it was your wish to buy the motor and the boat? A. Yes, it was my wish."

*Purchase of the Pontiac.* Relative to the purchase of the new Pontiac Emma Baird testified:

"Q. Now did you want to purchase another automobile? A. Yes, because he was so hard on my Chevvy and had to drive his relatives around.

\* \* \* \* \*

"Q. Now at whose suggestion was the deposit made at the Olney Pontiac? A. Both of us.

"Q. Where did that $200.00 come from? A. Out of the checking account."

*It was Plaintiff's Money.* Upon being interrogated as to her expenditures plaintiff testified that it was her money; that she could do what she wanted with it and that what she did with it was her business.

On cross-examination she gave the following testimony:

"Q. You don't drink? A. No, I do not, and *what I do with my own money is my business.*

\* \* \* \* \*

"Q. And you testified that you were prudent and careful in money matters? A. Yes, I was.

"Q. And that you are careful with your funds? A. Yes.

"Q. Have you had any unusual expenses during the months of October and November? A. That has nothing to do with him.

"Q. But you did have unusual expenses? A. I wouldn't say so, *it is my money.*

136

* * * * *

"Q. Do you want to tell me that you didn't have many unusual expenses? A. No.

* * * * *

"Q. Did you on October 3rd of this year cash at the Missoula Hotel checks in the amount of $125.00? A. Yes and I sent some of that money back to my home in North Dakota.

"Q. Who did you send it to? A. To my home.

* * * * *

"Q. Did you on October 10th cash a check for $50.00 at the Missoula Hotel? A. I don't recall.

"Q. Do you recall cashing any checks at the Missoula Hotel at any time? A. Sure I did but I don't recall when.

"Q. Do you recall cashing two checks in the amount of $25.00 each on the 10th of October in the Missoula Hotel? A. No, I don't recall that.

"Q. Would you say that you didn't do that? A. I don't think I did.

"Q. Now on October 11th of this year, did you cash nine $50.00 checks and one $100.00 check? A. No I don't.

"Q. Did you on October 13th cash a check in the amount of $25.00 at the Missoula Hotel? A. I don't recall.

* * * * *

"Q. On October 25th did you cash checks at the Missoula Hotel as follows: two $50.00 checks, one $25.00 check and one check in the amount of $15.00, making a total of $140.00 worth of checks that were cashed on October 25th? A. I can't remember and I don't think I did.

"Q. What did you do with the money for these checks? A. I can't remember.

"Q. On October 27th of this year, did you cash at the Missoula Hotel a check in the amount of $100.00? A. I don't remember, I don't think I did.

"Q. What did you do with the money? A. I can't remember.

* * * * *

"Q. On October 28th of this year did you cash a check at

the Missoula Hotel in the amount of $40.00? A. I can't remember.

"Q. On November 5th of this year did you cash a check at the Missoula Hotel, or I should say checks in the total amount of $400.00? A. No.

"Q. On November 10th of this year did you cash a check at the Missoula Hotel in the amount of $100.00? A. No.

"Q. On November 16th of this year did you cash a check at the Missoula Hotel in the amount of $100.00? A. I can't remember.

"Q. On November 15th of this year did you cash a check at the Missoula Hotel in the amount of $100.00? A. No.

"Q. On November 18th of this year, did you cash two checks at the Missoula Hotel in the amount of $100.00? A. I can't remember.

"Q. You can't remember? A. That might have been some of the money that I sent to a friend of mine back home.

\* \* \* \* \*

"Q. Did you cash checks on the Bismarck bank? A. Yes.

"Q. So then you were cashing these checks at the Bismarck or at the Missoula Hotel to take to Bismarck with you? A. Yes.

"Q. Did you on November 12, cash checks in the total amount of $140.00? A. I can't remember.

\* \* \* \* \*

"Q. Do you remember back in the cross-examination that you testified that you played the slot machines? A. I don't remember that but I do play them some.

"Q. Have you been playing the slot machines during the month of October and November? A. Some.

\* \* \* \* \*

"Q. And you want the court to believe that you would cash your checks here in Missoula and then send the money back to North Dakota? A. *Yes, it was my money and I could do what I wanted with it.*

"Q. You say that you played the slot machines? A. Some, yes.

"Q. Is it not true that you have been playing these machines a good deal? A. I said some.

"Q. As a matter of fact, is it not true that you have put the greater share of that $1,800.00 into the slot machines? A. I played them some but I think that I owe that to myself."

The money and bonds which plaintiff brought with her from North Dakota were her property. She had the right to dispose of this property as she pleased. For what and on whom she spent her money was her business. How she disposed of her bonds was likewise her business. These rights she exercised to the fullest extent. The funds, credits and other personal property which she voluntarily delivered and transferred to her husband without consideration but with donative intent constituted gifts, R. C. M. 1947, sec. 67-1706, the essential elements whereof are: the delivery, the accompanying donative intent and acceptance by the donee. O'Neil v. O'Neil, 43 Mont. 505, 511, 117 Pac. 889, Ann. Cas. 1912C, 268. The giver has the legal right to make and the donee has the corresponding legal right to accept a gift. Upon his acceptance of the gift the donee acquires the property so transferred. R. C. M. 1947, section 67-1201. Title to the executed gift passes from the giver to the donee. What the donee thereafter does with such executed gift is his business. "A gift, other than a gift in view of death cannot be revoked by the giver." R. C. M. 1947, section 67-1708. Nor should he subsequently gain the disfavor of the giver may the donee be held liable as the debtor of the giver nor may he be held liable to account to her. 30 C. J., Husband and Wife, sec. 303, p. 707, 41 C. J. S., Husband and Wife, sec. 156; Black v. Black, 30 N. J. Eq. 215; Pieretti v. Seigling, supra.

"After marriage arrives a reaction, sometimes a big, sometimes a little, one; but it comes sooner or later, and must be tided over by both parties if they desire the rest of their lives to go with the current." Kipling. Here the reaction,—a little one, arrived eleven days before the first wedding anniversary when the wife voluntarily quit her husband,—left his home,— sued him for fraud and then took the first train for North

Dakota where she remained until her marriage had endured a year so that she could sue for divorce grounded on cruelty "existing and persisted in for a period of one year before the commencement of the action" as provided by R. C. M. 1947, section 21-106. On the fourth day after the first anniversary of the wedding, the plaintiff returned to Missoula and that day, September 26, 1948, filed suit No. 17805 for divorce alleging extreme cruelty.

This divorce suit is separate and distinct from her suit in equity No. 17785 for fraud. The pleadings and issues are separate and distinct. Orderly procedure requires that the two suits be kept separate and distinct throughout. However, the district court heard the evidence in both the equity suit No. 17785 and the divorce suit No. 17805 at the same hearing, resulting in a jumbling of the evidence and issues. Of such so-called "time saving" practice we do not approve. The result has been confusion. We are here concerned only with the suit in equity No. 17785 wherein an appeal was taken. We have no jurisdiction of the divorce action No. 17805 wherein there was no appeal. Neither the pleadings nor the decree, if any was entered in the divorce suit, are before us. True the bill of exceptions herein purports to set forth the evidence submitted in both the suit in equity No. 17785 and the divorce action No. 17805. This is because it is impossible to unscramble the evidence introduced at the trial. Thus have the waters become muddied,—the issues and evidence confused and much unnecessary expense, labor and inconvenience occasioned.

In the instant suit in equity No. 17785, plaintiff complains that prior to their wedding her suitor "fraudulently represented to her that he was an honest, honorable man." This is not fraud. It is life. Common ordinary every day life.

"The first proof a man gives of his interest in a woman is by talking to her about his own sweet self. If the woman listens without yawning, he begins to like her. If she flatters the animal's vanity, he ends by adoring her." Kipling.

To entitle plaintiff to the relief for which she prays plaintiff

 was required to both plead and prove a case of actionable fraud. She did neither. Accordingly the decree is reversed and the cause remanded to the district court with directions to enter judgment dismissing the action with prejudice.

MR. JUSTICES BOTTOMLY and FREEBOURN, concur.

MR. JUSTICE ANGSTMAN: dissenting.

At about the time that this action was commenced plaintiff likewise filed an action for divorce. Both actions were tried together. The court found for plaintiff in both actions. There has been no appeal from the decree granting plaintiff a divorce.

We do not have before us in this action the complaint in the divorce action. We are not advised as to what the allegations of that complaint were. Presumably it was based upon cruelty.

Plaintiff testified: ''Q. Now Mrs. Baird, you have alleged certain acts of cruelty by the defendant in your complaint, would you tell the court something of those alleged acts of cruelty? A. Well, he struck me three times.

''Q. Do you recall the approximate times that he struck you? A. In June we were out with some of his relatives and he got mad about something and hit me.

''Q. Was there any reason for doing that? A. I don't know why he hit me.

''Q. Do you remember the date of that? A. I don't know exactly but it was sometime in June, 1949.

''Q. He had no reason to strike you? A. No.

''Q. Will you describe how he struck you? A. Right on my mouth.

''Q. With his fists? A. Yes.

''Q. He hit you right in the mouth with his fists? A. Yes.

''Q. Were there any other times that he struck you that you can remember? A. Yes.

''Q. When was that? A. In August, 1949.

''Q. What were the circumstances surrounding that time in August? A. We were together, driving in the car, and he got mad about something again and hit me.

"Q. At that time did he use his fists? A. I couldn't say for sure just how he hit me but he did hit me.

"Q. Why can't you say for sure? A. Well, he hit me with his hand.

"Q. You don't remember whether or not he hit you with his fist doubled up? A. No I don't.

"Q. Now will you tell the court any other acts of cruelty by the defendant? A. Well, he just used me as a maid and never as a wife.

"Q. From the time that you were first married? A. Yes, and he always wanted to get my money.

"Q. Anything to get money from you? A. That's right.

"Q. Now what about these money matters, was he cruel to you about money? A. He sure was and then he kept talking to me about getting a divorce."

Hence the authorities cited and quoted from in the majority opinion dealing with the question of annulling a marriage on the ground of fraud are inapplicable here. The fraud here alleged is relied on not as a ground of divorce but as a reason why plaintiff should have her property restored to her. Likewise fraud may be considered to show cruel and inhuman treatment. Longtin v. Longtin, Sup., 22 N. Y. S. (2d) 827, the case so strongly relied on in the majority opinion, so holds.

"Equity and good conscience require that the husband shall not profit by his own wrong in forcing his wife to divorce him, that restitution shall be made to her of the property which she brought to him * * * The policy of the law should be, and is, to do justice and to give to the injured wife not merely what necessity, but what justice, demands." 17 Am. Jur., Divorce & Separation, sec. 599, p. 469.

To the same general effect is 27 C. J. S., Divorce, sec. 297, page 1132. This is but another way of saying that the husband "should not reap where he did not sow." Faris v. Williams, 154 Fla. 6, 16 So. (2d) 293, 294, and that he should not profit by his own wrong. "It is recognized that when a wife by labor and industry or when she advances money to her husband and

used by him in a business, the law will not permit a forfeiture thereof to the husband.'' Masilotti v. Masilotti, 150 Fla. 86, 7 So. (2d) 132, 135.

''If the wife has, from equitable considerations, other and additional interests in her husband's property than such as attach to her status as a wife—as, if her money came to the hands of the husband, and has been invested by him in real estate to which he holds the title, or if her earnings or savings have gone into his possession and aided him in acquiring the real estate—the court may properly, when dissolving the marriage relation, decree that the wife shall be vested with the title in fee to such real estate or some other real estate belonging to the husband, in order to effect an equitable and fair adjustment of the property rights of the parties.'' Champion v. Myers, 207 Ill. 308, 69 N. E. 815, 816.

This principle is simply a recognition of the statement made by Mr. Chief Justice Adair in his dissenting opinion in Detert v. Detert, 115 Mont. 313, 142 Pac. (2d) 215, 229, and as to which doubtless all members of the court would agree. He there said: ''Marriage is something more than a mere 'share the wealth' arrangement and the relation should not be considered as a license to loot the estate or fraudulently acquire the property of either spouse.''

A court of equity, to avoid a multiplicity of actions, will return to the wife in the divorce action property which originally belonged to her but which the husband acquired by taking advantage of the marriage relation to gain its possession. Mergenthaler v. Mergenthaler, 69 Cal. App. (2d) 525, 160 Pac. (2d) 121; Smith v. Smith, 110 W. Va. 82, 157 S. E. 37; Faris v. Williams, supra; Champion v. Myers, supra.

But in view of this court's opinion in Shaw v. Shaw, 122 Mont. 593, 208 Pac. (2d) 514; Emery v. Emery, 122 Mont. 201, 200 Pac. (2d) 251, and kindred cases, plaintiff based her right to restitution of her property upon the ground of fraud practiced upon her by defendant.

I think Judge Comer was justified in finding the allegations

of the complaint to be true and in entering the decree which he did. The decree simply directs defendant to pay to plaintiff the $8,050 which he is holding as trustee within 60 days from the date of the judgment or the property held by defendant will be sold under the order of the court to liquidate the trust.

The complaint, so far as this action is concerned, charges fraud upon defendant in inducing her to marry him by falsely and fraudulently representing to her that he was an honest man and that he loved her and wanted to make a home for her and lead a happy, normal married life; that plaintiff believed these representations to be true and would not have consented to the marriage had she known they were not true. The complaint alleges that defendant is in fact dishonest and dishonorable; that he did not love her and did not want to lead a happy, normal married life and did not want to make a home for her; that all he wanted from plaintiff was her money; that throughout the marriage which lasted for about a year, defendant has constantly schemed and connived ways and means to procure plaintiff's money, and that he did in fact procure $5,500 in cash and the sum of $2,550, the proceeds of certain bonds held in the joint names of plaintiff and defendant, but which was plaintiff's property; that by reason of the false and fraudulent representations plaintiff was prevailed upon to support defendant from the time of the marriage until on or about the 2nd day of September 1949; that prior to the marriage plaintiff was a widow and the owner of $34,000 worth of property; that defendant during the marriage has been earning and is capable of earning $250 per month; that the $5,500 above mentioned was applied by defendant on the purchase price of a dwelling house and the title was placed in his own name only, against the wishes of plaintiff; that with the proceeds from the bonds above mentioned defendant purchased a Pontiac automobile and took the title in his own name against the wishes of plaintiff; that were it not for the false and fraudulent representations made to plaintiff she would not have permitted defendant to have access to her money; that she has demanded that defendant

return to her the money which he thus obtained or that he transfer title to her to all the property purchased by him with the money thus falsely and fraudulently obtained from her, but this he has refused to do.

The answer is in effect a general denial except that defendant admits he has been earning and is capable of earning $250 per month.

The majority opinion holds that the evidence is insufficient to warrant the findings of the court, and particularly that there is not sufficient evidence to show any fraud on the part of defendant; that at most it shows merely a courtship followed by an unsuccessful marriage during which plaintiff made some gifts to defendant.

The facts are briefly these: Plaintiff and defendant met at about four o'clock one morning when plaintiff boarded a train at Yakima, Washington, en route to Bismarck, North Dakota. Defendant was already on the train, returning to Missoula from Seattle. They had coffee together and struck up a conversation. At that time plaintiff resided at Bismarck, North Dakota, and defendant in Missoula, Montana. They corresponded by letter and telephone, later became engaged, and on September 21, 1948, intermarried. Prior to the marriage, but after the engagement, plaintiff opened a joint checking account in the bank in Missoula and placed in it her own funds. It is conceded that after the marriage plaintiff paid $5,500 from the joint checking account to discharge a mortgage on defendant's home. She also placed government bonds in their joint names. These were first kept in a joint safety deposit box, but defendant without plaintiff's knowledge moved them to a box of his own. It is conceded that she furnished $2,550 with which to buy an automobile, a boat and a motor. She denied that these advancements were intended to be gifts to defendant. She said that it was the understanding that the home should be placed in her name along with that of defendant and that the automobile should be in her name. The record shows that when the automobile was purchased, the papers were first made out so that title would

stand in the name of plaintiff. But defendant, without plaintiff's knowledge or consent, had the papers changed so that title stood in his own name and that is how it now stands. When plaintiff complained about her name not being on the real property, defendant said to her, "If you want to be that way with me, you might as well get a divorce." This took place shortly after the marriage and before the ink was dry on the mortgage satisfaction. Plaintiff testified that immediately after the marriage defendant ceased to act as though he loved her and that he treated her as a maid and not as a wife.

I think there is sufficient evidence to sustain the findings of the trial judge. Fraud like any other fact may be proved by circumstantial evidence. If, as plaintiff says, and as defendant admitted, the marriage was to be a fifty-fifty proposition and the property to stand in the name of both, the defendant breached that understanding shortly after the marriage. He likewise denied to her shortly after the marriage the love, affection and good faith dealings which he professed before the marriage and on the strength of which she parted with her money. It is, of course, difficult to ascertain the exact state of mind of defendant at the time he assumed the confidential relationship involved in the marriage status. His state of mind can only be revealed by his subsequent actions. The record supports the conclusion that he did not fulfill the obligations which he had assumed of providing a home and living a normal life with plaintiff as her husband.

"Fraud cannot often be proven by direct evidence. Fraud conceals itself. It does not move upon the surface in straight lines. It goes in devious ways. We may with difficulty know 'whence it cometh and whither it goeth.' It 'loves darkness rather than light, because its deeds are evil.' It is rarely that we can lay our hand upon it in its going. We are more likely to discover it at its destination, before we know that it has started upon its sinuous course. When we so discover it, the search light of a judicial investigation goes back over its trail and lightens it from beginning to end. As the woodsman follows

his game by slight indications, as a broken twig or a displaced pebble, so fraud may become apparent by innumerable circumstances, individually trivial, perhaps, but in their mass 'confirmation strong as proofs of holy writ.' The weight of isolated items tending to show fraud may be 'as light as the shadow of drifting snow,' but the drifting snow in time makes the drift, the avalanche, the glacier. Fraud may hang over the history of the acts of a man like the leaden-hued atmosphere upon the house of Usher, 'faintly discernible but pestilent, an atmosphere which has no affinity with the air of Heaven.' '' Merchants'. Nat. Bank v. Greenhood, 16 Mont. 395, 429, 41 Pac. 250, 259, 851.

The rule is that: ''If at the time of the transfer or gift of property to one spouse by the other, by way of gift or post-nuptial settlement, the former does not contemplate keeping the marriage vows and the intention to violate them is subsequently carried out, the weight of authority supports the proposition that this conduct constitutes such a fraud on the innocent spouse in the inception of the transaction as will be a ground for avoiding it.'' 29 A. L. R., p. 210, note.

The principles relied upon here were applied in Meldrum v. Meldrum, 15 Colo. 478, 24 Pac. 1083, 11 L. R. A. 65; Johnson v. Johnson, 122 Wash. 117, 210 Pac. 382; Munroe v. Munroe, 20 Or. 579, 26 Pac. 838; and Murdock v. Murdock, 49 Cal. App. 775, 194 Pac. 762. While the circumstances showing fraud in this case are not as patent as in the cited cases, yet they are sufficient to sustain the trial court's findings.

The majority opinion holds that under the evidence and the law there is a presumption that advancements made by plaintiff to defendant were gifts.

In Bingham v. National Bank of Montana, 105 Mont. 159, 72 Pac. (2d) 90, 113 A. L. R. 315, in my dissenting opinion, I pointed out that by the weight of authority advances made by a wife to her husband are not presumed to be gifts. This court, however, has adopted the view that the presumption of a gift obtains. At most the presumption is a rebuttable one and there

is evidence here overturning the presumption. But the majority opinion holds that the presumption may not be overcome as a matter of law by the testimony of an interested witness. The case of McLaughlin v. Corcoran, 104 Mont.. 590, 69 Pac. (2d) 597, 600, is relied on.

There the court said: "A disputable presumption is not overcome, as a matter of law, by positive testimony to the contrary by an interested. witness, and in such circumstances a question of fact is tendered to be decided by the court or judge."

Here if the question of gift or no gift is material, then we have an implied finding by the trial judge against the gift theory and that finding is supported by ample evidence.

But if we regard the advances as gifts, the result is the same —the gifts, if such they be, were intended to be made on the basis of defendant's promises to lead a normal wedded life and prepare a home for plaintiff. The failure to do so would constitute a fraud upon the rights of plaintiff. Compare Huffine v. Lincoln, 52 Mont. 585, 160 Pac. 820.

If the advancements were ever intended as gifts, they were made on the supposition that defendant was and would continue to be her trusted husband, and not a scheming adversary bent on divesting her of her property and then compelling her to obtain a divorce.

It is conceded that plaintiff, as a result of the marriage, is short by more than $8,000 and defendant has gained that much by having his debt paid in the sum of $5,500 and by having a new automobile, boat and motor, costing another $2,550. To permit defendant to retain these amounts under the circumstances here shown works a fraud upon plaintiff, and the trial court was right in so holding. I think the judgment should be affirmed.

MR. JUSTICE METCALF: dissenting.

There is evidence that Mrs. Baird never intended the money advanced to her husband to be a gift. This evidence convinced the trial judge, who was the trier of the facts. The presumption

of a gift from one spouse to the other was rebutted. The judgment should be affirmed.

Rehearing denied June 21, 1951.