GEORGE D. HART, Plaintiff and Appellant, *v.* ORVAL M. HONRUD and ESTHER HONRUD, His Wife, Defendants and Respondents.

No. 9409.

Submitted February 7, 1957.   Decided March 11, 1957.

Rehearing Denied April 17, 1957.

309 Pac. (2d) 329.

Messrs. Wuerthner & Wuerthner, Great Falls, for appellant.

Mr. Robert W. Hurly, Glasgow, Mr. James T. Harrison, Malta, Mr. Arthur P. Acher, Helena, for respondents.

Mr. Julius J. Wuerthner and Mr. John P. Wuerthner argued orally for appellant.

Mr. Acher argued orally for respondents.

The Hon. W. W. LESSLEY, District Judge:

On rehearing granted and had the opinion and decision pronounced November 21, 1956, in this cause is ordered withdrawn and the following is substituted therefore as the opinion of this court herein.

This is an appeal from a decree in a suit to quiet title. Issue was joined and the matter heard by the lower court, sitting without a jury.

The lower court by its findings of fact and conclusions of law found generally for the defendant Honrud, and entered a decree for specific performance so far as plaintiff was able to convey title, with adjustment of the purchase price, and reserved jurisdiction to settle accounts between the parties.

The plaintiff, George D. Hart, appeals from the decree entered.

The essential facts are: On May 29, 1950, by written contract, George D. Hart, the plaintiff, agreed to sell, and the defendant, Orval Honrud, agreed to purchase, certain ranch lands. The plaintiff Hart, at the time of the contract, was in possession of all the lands described in the contract, and was the owner of a portion of the lands; the remaining portion was owned by his brother, John Hart.

At the time of the execution of the contract, an initial payment of $2,500 was accepted by the seller Hart from the purchaser Honrud. The total price for all the lands was $15,500 and the balance of $13,000 was to be paid by the purchaser when seller Hart, pursuant to the terms of the contract, furnished him with good and sufficient deeds and titles to all of the lands so agreed to be sold. As provided for in the contract, possession of all the land was given at once to the purchaser Honrud with

the exception of a dwelling house where the seller Hart resided for a time by paying the R.E.A. bill each month.

This provision appeared in the contract at the time of its execution:

"It is understood and agreed that if good and sufficient title is not furnished on or before March 1, 1951, the sum of $2,-500.00 paid down shall be returned to the purchaser and the purchaser shall pay to the seller ¼ of the crops raised on the land which is the subject of this sale, or if the crops have been sold, the value of the crop share (¼) on the date of sale * * *''

The following provision was written into the contract by striking out the period after the word "sale" and adding:

"* * * purchaser shall reimburse seller for value of pasture, seller shall pay purchaser for summer fallow and breaking done over and above extent of such operation in previous year; and all land leases shall be re-transferred to the seller by the purchaser."

This was done at the request of Hart, about thirty days after signing the original contract. It was initialed by both parties to the agreement.

Honrud cropped the lands during 1950 and 1951. At the beginning of the farming year 1952 the seller took possession and farmed the lands for the years 1952 and 1953.

It appears that in order to comply with the contract, Hart needed to quiet title to a portion of the lands, probate the estate of his deceased mother, Maria Hart, and secure title of his brother's share of the lands sold. Thereafter he did quiet title but went no further in the probate than filing the 2F report with the State Board of Equalization; secured a deed from all the heirs of Maria Hart but kept the deed secret even from his lawyer; wrote a letter between May 29, 1950, and June 16, 1950, to his brother John about the sale of John's land by him; mailed a letter with deed to be signed June 16, 1950, and visited with his brother in 1952 for a very short time but not about the sale of the land.

The record further discloses that subsequent to the signing of the contract, so-called "offers" were made. They were three in number and can be summarized as: First, in the summer of 1950 Hart offered to quitclaim to Honrud all of his interest in the lands contracted to be sold; second, Hart offered to secure a deed from his brother of the lands contracted to be sold if the contract price was increased $2,000 by Honrud, and finally he made an "offer" of a new contract to Honrud.

The plaintiff, George D. Hart, has assigned a number of errors, both as to the lower court's findings of fact and as to its conclusions of law. We will not attempt to discuss all of the assignments, points and authorities in detail. We will consider generally the questions raised by them for when summarized in their final analysis, they raise only four issues:

1. Was the plaintiff, George D. Hart, guilty of bad faith?

2. Was the direction of specific performance with adjustment out of the purchase price for the deficiency proper?

3. Was the type of clause found in the contract of sale for the benefit of the seller Hart?

4. Was consideration given by the trial court of the value of crops or the use of the lands here involved during the defendant Honrud's possession?

The plaintiff, George D. Hart, contends the trial court erred in finding him guilty of bad faith but we here indulge the presumption that the judgment of the trial court is correct. Ordinarily the findings of the trial court will not be disturbed where the evidence, although conflicting still when fully considered it furnishes reasonable grounds for different conclusions. Ordinarily where there is substantial evidence to support the findings they should not be set aside. Gibbs v. Gardner, 107 Mont. 76, 80 Pac. (2d) 370; Dalbey v. Equitable Life Assurance Society of United States, 105 Mont. 587, 74 Pac. (2d) 432; H. Earl Clack Co. v. Oltesvig, 104 Mont. 255, 68 Pac. (2d) 586; Missoula Light & Water Co. v. Hughes, 106 Mont. 355, 77 Pac. (2d) 1041; Sanders v. Lucas, 111 Mont. 599, 111 Pac. (2d) 1041, 1042; In re McDonald, 112 Mont. 129, 113 Pac. (2d) 790;

Wieri v. Anaconda Copper Mining Co., 116 Mont. 524, 156 Pac. (2d) 838; Hankins v. Waitt, 120 Mont. 596, 189 Pac. (2d) 666; Allen v. Petrick, 69 Mont. 373, 222 Pac. 451; Warren v. Senecal, 71 Mont. 210, 228 Pac. 71; Anaconda National Bank v. Johnson, 75 Mont. 401, 244 Pac. 141; Gibson v. Morris State Bank, 49 Mont. 60, 140 Pac. 76; Barnard Realty Co. v. City of Butte, 55 Mont. 384, 177 Pac. 402; Gilbert v. Bostona Mines Co., 121 Mont. 397, 195 Pac. (2d) 376; Whorley v. Koss, 122 Mont. 446, 206 Pac. (2d) 809; Caley v. Kolstad, Mont., 292 Pac. (2d) 995; Porter v. Moore, Mont., 300 Pac. (2d) 513.

There is ample support for the court's finding of bad faith. The evidence shows at the time the contract was entered into, the plaintiff Hart, in answer to a question by attorney White who drew the contract, said that he (George D. Hart) didn't have a power of attorney from his brother John to sell his land and that he didn't need one; that he knew what his brother wanted for his place; that he had been told by his brother that if he sold his own land he must sell his brother's land also. This is substantiated by Hart's own testimony in effect that he had led others to believe he had the right to sell his brother's land. Hart then and there made a positive representation of his authority to sell all the land at the very inception of the contract. This was clearly a statement of fact, known to him to be untrue, at the very moment of its making. The record is eloquent on this point.

The plaintiff Hart testified on the trial that in truth and fact he knew at that time that he couldn't sell it (meaning John Hart's lands). John Hart's deposition of course gives substance to the bad faith admitted by the plaintiff, George D. Hart. In brief it states that never, at any time prior to May 29, 1950, was there any agreement of any kind with his brother George, for a possible sale or agreement to sell his lands; that George Hart visited him several years before May 29, 1950, and the subject of sale of lands was mentioned but no definite plans were made in this regard; that he never at any time requested his brother to sell his lands.

Clearly, Honrud the defendant purchaser relied upon the false representation made to him by the plaintiff Hart. He so testified, and said in effect, that Mr. White (the attorney) took his word for it, just the same as he did, and that the land was included in the written contract to sell.

Our statute, R.C.M. 1947, section 13-308, defines fraud. Placing the record here in opposition to the statute, leads to the inevitable conclusion that the plaintiff Hart was guilty of bad faith; here is fraud as a matter of law. The district judge was correct in his finding of bad faith on the part of the plaintiff Hart.

While, it is true that the solution of any issue may rest upon circumstantial evidence, and this is particularly true of bad faith, the record here on the question of bad faith is unequivocal. In Merchants' National Bank v. Greenhood, 16 Mont. 395, 429, 41 Pac. 250, 259, 851, this court said: "The weight of isolated items tending to show fraud may be 'as light as the shadow of drifting snow,' but the drifting snow in time makes the drift, the avalanche, the glacier." With that before us, consider the actions of the plaintiff Hart after the signing of the contract May 29, 1950, and before March 1, 1951. He claimed he had no results from his letter to his brother but thought there might be a possibility that he would change his mind, as anything could happen. His efforts to comply with his solemn bargain were two letters to his brother; a number of so-called "offers" by Hart (that are most significant), delay in quieting title to other lands, and failure to close the probate of the Maria Hart lands and secreting the deed obtained from the heirs of Maria Hart. Less than two months after the contract, Hart was telling Honrud it looked like "we was headed for trouble." The other "offers" only lend color and substance to the original fraud and make clear the forming outlines of the drift, the avalanche, the glacier. There are too many evidences of bad faith to burden this opinion. The kindest thing that can be said is that the actions, the statements of the plaintiff Hart appearing

in this record, are not those of a man attempting in good faith to perform a solemn obligation.

The trial court was correct in making findings as to specific performance with abatement out of the purchase price for the deficiency. The rule is well established that a court of equity may decree specific performance to the land with abatement from the purchase price. Marshall v. Caldwell, 41 Cal. 611; Kuper v. Scroggins, 127 Colo. 416, 257 Pac. (2d) 412; English v. Jones, 154 Tex. 132, 274 S.W. (2d) 666; Prosser v. Schmidt, 118 Colo. 502, 197 Pac. (2d) 318; Wellington Realty Co. v. Gilbert, 24 Colo. App. 118, 131 Pac. 803; Cowan v. Kane, 211 Ill. 572, 71 N.E. 1097, and see Pomeroy's Equitable Remedies (2d. ed.), section 2256. Once it is apparent that an equity court may so act, it is clear that the means to act are granted. With that statement we dismiss plaintiff's concern on the value placed on the John Hart lands. Further, the record as made by the plaintiff Hart himself supports substantially the court's findings in this regard.

We refer to the clause of the contract mentioned earlier in this opinion. It is upon this clause that the plaintiff Hart grounds his argument that he could properly terminate the contract by reason of the fact that his titles were not merchantable upon March 1, 1951.

At the outset we accept the view that parties may stipulate in their contract what the measure of liability shall be in case of the failure of the vendor to perform.

But the application of that rule is limited; it does not apply where the vendor has been found guilty of bad faith. To apply such rule in such case would be to allow the vendor to profit by his own bad faith and rob a contractual obligation of its solemnity. Such a provision, so used by a bad faith vendor becomes a "trap" for the purchaser. Otto v. Young, 227 Mo. 193, 127 S.W. 9. However, "Such a provision has no reference to a situation where the vendor can make title, but fails to do so. It covers only the case where title is not good *and in good faith cannot be made good.*" Emphasis supplied. Nostdal v. Morehart,

132 Minn. 351, 157 N.W. 584, 585; Joslyn v. Schwend, 85 Minn. 130, 88 N.W. 410 and on rehearing 744.

Also Schwab v. Baremore, 95 Minn. 295, 104 N.W. 10, 11, comments:

"Within this rule, defendant has a legal right with plaintiff to invoke this particular feature of the contract, *in the absence of a showing of fraud on his part* to avoid performing the same." Emphasis supplied.

The trial court having once found bad faith on the part of the seller Hart, it was consistent in denying to him refuge under this provision. To hold otherwise would be granting contractual asylum to the fraudulent and penalyizing the innocent.

The trial court did consider the question of value of crops and use of lands here involved. The findings, conclusions and judgment show meticulous care and consideration for the rights of both parties in this unfortunate affair. To unscramble an omelet is not easy. The trial court retained jurisdiction with this portion of its judgment:

"It is Further Ordered, Adjudged and Decreed, and this does Order, Adjudge and Decree, that this Court retain full and complete jurisdiction of this cause to carry into effect and enforce the performance of each and every one, and all, of the matters and provisions of this Judgment and Decree, and for the purpose of adjusting between the plaintiff and defendant, Orval M. Honrud, any and all miscellaneous matters ancillary to the main purposes of this Judgment and Decree, and which may exist between the plaintiff and the said defendant, Orval M. Honrud."

The trial court sitting as a court of equity retained jurisdiction to make effective its decree and to consider all matters ancillary to the main issues. It had before it for decision the main issue of land contract between the parties and their acts under it. The other matters could be best settled after that question was answered. Butte & Superior Copper Co. v. Clark-Montana Realty Co., 249 U.S. 12, 39 S. Ct. 231, 63 L. Ed. 447, 460.

A careful examination of the record shows that the findings of fact are supported by the evidence. This conclusion can be and is reached without the necessity of indulging presumptions. The legal conclusions are based on the findings.

It follows from what has been said that the judgment of the district court should be and it is affirmed.

MR. JUSTICES CASTLES, BOTTOMLY and ADAIR, concur.

MR. JUSTICE ANGSTMAN, (dissenting).

I agree with my associates on the principles of law announced in the foregoing opinion. I differ with them in applying those principles to the facts of this case.

To be more specific, it is my view that the court may not grant any other or different relief from that specified in the contract unless there be a showing of fraud or bad faith on the part of plaintiff to avoid furnishing title in performance of the contract as written. The court, in my opinion, may not award different relief from that agreed to by the parties simply because there may have been bad faith on the part of plaintiff some place on the horizon, or because plaintiff was not as frank a witness as he might have been.

In other words, it is bad faith in performing the contract with respect to furnishing title and not bad faith in the making of the contract that authorizes the court to ignore its terms and award specific performance, so far as plaintiff is able to perform with an abatement in the price.

Unless bad faith is shown in avoiding performance of the contract with respect to title then it must be enforced according to its terms. The contract fixed the rights and remedies of both parties in case plaintiff did not furnish good title. Each party assumed certain duties and responsibilities upon failure to furnish title. The contract, and particularly that part relating to the consequences in case title was not furnished, was for the benefit of both parties and not alone for defendant's benefit.

It was plainly intended by the parties that if title to the John Hart land could not be obtained the entire contract was at an end and that defendant should then be entitled to the return of the down payment upon accounting to plaintiff according to the contract.

The parties have the right to stipulate as to the rights and remedies in case title cannot be made good and such provision binds both parties. Mackey v. Ames, 31 Minn. 103, 16 N.W. 541; Schwab v. Baremore, 95 Minn. 295, 104 N.W. 10; Marchman v. Fowler, 145 Ga. 682, 89 S.E. 780; Nostdal v. Morehart, 132 Minn. 351, 157 N.W. 584; 92 C.J.S., Vendor & Purchaser, section 603, page 653; 3 Williston, Contracts (rev. ed.), section 781A, page 2197; 15 Am. Jur., Damages, section 240, page 671; 55 Am. Jur., Vendor and Purchaser, section 567, page 960; Restatement, Contracts, section 339, note g, page 554; Raymond v. McKenzie, 220 Minn. 234, 19 N.W. (2d) 423; McGuckin v. Harvey, 177 Minn. 208, 225 N.W. 19; Brazill v. Weed, 115 Misc. 546, 190 N.Y.S. 43; Elliott v. Henck, Tex. Civ. App. 223 S.W. (2d) 292; Hanley v. Gables Trust Co., 147 Fla. 746, 3 So. (2d) 725; Pinkerton v. Crail, 113 Cal. App. 484, 298 Pac. 532; Riggs v. Gish, 201 Iowa 148, 205 N.W. 833.

I do not find in the record any evidence of collusion on the part of plaintiff and his brother to avoid performance of the contract. Nor do I find any evidence of bad faith on the part of plaintiff in his efforts to secure a deed from his brother.

Defendant admitted that he knew when the contract was entered into that part of the land was in the name of John Hart, plaintiff's brother. Plaintiff testified that when he made the contract he honestly believed he could get his brother to sell his land.

His positive representation that he didn't need a power of attorney was predicated upon his belief that his brother would go along with the sale. He did not know at that time that the statement was untrue as stated in the majority opinion, except that he admitted he had no power of attorney. This fact defendant knew. Likewise plaintiff's testimony that he could not

sell his brother's land, as recited in the majority opinion, must be taken in context and read with his entire statement.

This was his testimony:

"Q. You knew you could sell it? A. Well, I knew that I couldn't sell it. Q. Oh, you knew you couldn't sell it? A. Not without his consent because it was in his name."

To say that plaintiff admitted bad faith is in my opinion unwarranted. Neither can it be said that defendant relied on the representation of authority made by plaintiff.

Defendant's statement that he took plaintiff at his word is completely and conclusively refuted by the written contract which in substance was that if title was not furnished by March 1, 1951, the down payment should be returned and the transaction, in legal effect, considered as a lease with a division of the crops as stated in the contract and an adjustment for summer fallowing and breaking and pasture rental.

The written contract cannot be contradicted by parol. First National Bank of Plains v. Green Mt. Soil Conservation Dist., Mont., 293 Pac. (2d) 289; Bauer v. Monroe, 117 Mont. 306, 158 Pac. (2d) 485.

Defendant by the written contract said to plaintiff in legal effect, "I do not rely upon your statement that you have authority to sell your brother's land. I wish to make it clear by contract that if you do not have authority, and if you do not produce the title by March 1, 1951, I want my money back." That is what the parties agreed to.

Of course no one may take advantage of his own wrong, and hence if plaintiff is deliberately failing to furnish title when it is within his power to do so then the courts will intercede. But I do not find here any evidence that plaintiff did not proceed in good faith to attempt to obtain a deed from his brother.

After the contract was made plaintiff had a deed prepared and sent it to his brother for signature. This was done on June 16, 1950. His brother refused to sign it stating that he did not want to sell his land. Plaintiff went to Indiana in the fall of

1950 and spoke to his brother about putting his land in on the deal, but was unsuccessful in getting him to do so.

John Hart came to Montana in the fall of 1951 and plaintiff again tried to get him to go through with the deal and he refused to do so. Defendant himself talked with John Hart in the fall of 1951 and was told by him that he refused to convey the land to defendant.

I do not find any evidence of fraud or bad faith on plaintiff's part in endeavoring to furnish title to the John Hart lands. Just why would plaintiff have made the contract in the first instance if he knew his brother would not go through with it?

The fact that plaintiff did not exert diligence in probating the estate of his mother, Maria Hart, if such is the fact, is of no moment here.

When he was met with the refusal of John Hart to join in the transaction, he was helpless so far as his ability to furnish title in compliance with the contract was concerned.

The fact that about two months after making the contract plaintiff told defendant it looked like, ''we was headed for trouble'' is just what anyone would have stated after learning that John Hart would not join in the sale. Likewise, the offers to convey, so far as plaintiff was able, do not lend color or substance to fraud as stated in the majority opinion.

He was under no obligation to make any offer. The written contract covered the point and all he had to do was to stand on it so long as he attempted in good faith to produce title to his brother's land.

Neither do I think that plaintiff's suggestion to defendant that he up the offer by $2,000 should be considered as a badge of fraud. Plaintiff was simply hopeful that some plan might be worked out to induce his brother to join in the sale. He had not discussed this matter with his brother and did not know whether even such an offer would be accepted by him.

I have accepted the rule as stated in the majority opinion, and as announced by many decisions of this court that if there be

substantial evidence in the record to support the findings of the trial court we will not interfere with them.

However, some members of this court think that in an equity case such as this, this court, even though the evidence be conflicting, must and can weigh the evidence from the cold record and determine wherein lies the preponderance of the evidence, unaffected by the determination of the trial court. See Sanders v. Sanders, 124 Mont. 595, 601, 229 Pac. (2d) 164; Miller v. Miller, 121 Mont. 55, 190 Pac. (2d) 72; 12 Mont. Law Review, 36.

If there be any evidence of bad faith on the only point here involved, viz, on the matter of furnishing title to the John Hart land (a point I do not concede) then certainly this case is one where it might be appropriate to exercise the talents of this court in determining whether the findings to that effect are supported by the preponderance of the evidence.

I think the opinion first rendered by this court, which was concurred in by four members of the court with only one member dissenting was correct and that the judgment should be reversed and the cause remanded with directions to take further evidence to the end that an accounting may be had and settled between the parties based upon the contract.