PATRICIA JOSEPHINE REYNOLDS, PLAINTIFF AND RESPONDENT, v. FRANK THOMAS REYNOLDS, DEFENDANT AND APPELLANT.

No. 9644.
Submitted April 29, 1957. Decided October 16, 1957.
As Amended on Denial of Rehearing November 15, 1957.
317 Pac. (2d) 856.

304

Mr. Raymond Hildebrand, Glendive, Mr. Ralph J. Anderson and Mr. Stanley P. Sorenson, Helena, for appellant.

Mr. Michael J. Whalen, Mr. Joseph F. Meglen, Billings, Messrs. O'Neil & Cavanaugh, Glendive, for respondent.

Mr. Anderson and Mr. Whalen argued orally.

MR. JUSTICE ANGSTMAN:

Plaintiff brought this action for separate maintenance upon the ground that defendant without provocation inflicted physical and mental cruelty upon her causing her to leave him and live separate and apart from him.

The cause was tried to the court sitting without a jury. Findings of fact and conclusions of law went in favor of plaintiff and against defendant. The court awarded plaintiff a decree of separate maintenance and ordered defendant to pay the sum of $700 per month for her support and maintenance and $3,000 attorney's fees in addition to what had theretofore been allowed and $400 costs. Defendant has appealed from the judgment and order for costs, attorneys' fees and maintenance allowance.

The transcript consists of three volumes containing more than 700 typewritten pages, but we find no useful purpose in summarizing all the evidence here. Defendant contends that the evidence is insufficient to support the findings and judgment and particularly the findings that defendant was guilty of such conduct as to entitle plaintiff to live separate and apart from him and to entitle her to a decree of separate maintenance.

Defendant in reliance on section 93-216, R.C.M. 1947, as interpreted in Sullivan v. March, 124 Mont. 415, 225 Pac. (2d) 868, and other cases cited in the Sullivan case, contends that we should overturn the findings of the trial judge on the question of cruelty inflicted by defendant upon plaintiff.

Since this is an equity case we have the right and it is our duty to review the facts, but it is a mistaken notion that this power or duty necessarily requires the overturning of the findings made by the trial judge.

Where the evidence is conflicting we incline toward sustaining the trial judge's findings, since he has the advantage over us of having seen the witnesses and having observed their demeanor and appearance, and hence is in a better position to judge of their credibility than are we. Williams v. Williams, 85 Mont. 446, 278 Pac. 1009. Stefonick v. Stefonick, 118 Mont.

486, 167 Pac. (2d) 848, 164 A.L.R. 1211; Hjermstad v. Barkuloo, 128 Mont. 88, 270 Pac. (2d) 1112; Hart v. Honrud, 131 Mont. 284, 309 Pac. (2d) 329.

The record shows that the parties met in Ireland in the spring of 1952 where plaintiff then lived and where defendant was vacationing. After defendant returned to the states they corresponded with each other by letter, and on November 15, 1953, plaintiff met him at Long Island City, New York, where they were on that day married. They then took up their residence in Glendive, Montana, where defendant was engaged in business. At the time of the trial plaintiff was thirty-six years of age and defendant sixty-seven. The marriage seemingly was doomed to failure from the beginning. Plaintiff left defendant on December 12, 1953, returning to New York City after living with defendant twenty-seven days.

She testified that she was forced to leave defendant because of his treatment of her. She related a series of brutal acts on the part of defendant which need not be repeated here. His counsel contends that her story is so improbable that it is unworthy of belief and comes within the rule of Casey v. Northern Pacific Ry. Co., 60 Mont. 56, 198 Pac. 141. We cannot say that the trial court was in error in not applying the rule of the Casey case as to her testimony. Certainly all of her testimony could not be condemned within the rule of that case. Some of it was corroborated by disinterested witnesses.

There was sufficient substantial and credible evidence to sustain the trial court's finding of cruelty on the part of defendant toward plaintiff to justify the court's conclusion even though some of plaintiff's evidence be discarded as incredible.

The evidence on most points is in sharp conflict. If the court thought some of plaintiff's story incredible the most it could have done was to treat the rest of her testimony with distrust. R.C.M. 1947, section 93-2001-1, subd. 3. The court was not bound to disregard all of her testimony.

The cold record does not indicate that the evidence is insufficient to support the findings of the court with respect to

cruelty on the part of defendant justifying plaintiff in leaving him Defendant pleaded and submitted proof that he offered in good faith to effect a reconciliation and requested plaintiff to resume the marital relationship and solicited condonation. This was done before the commencement of the action and again after it was pending. Plaintiff refused the offers because she concluded they were not made in good faith when measured against his previous conduct.

The court did not err in concluding that the offers and solicitation of condonation were not made in good faith, and that they did not bar plaintiff's cause of action. The record shows that at the very time defendant was soliciting condonation he was exploring the possibility of obtaining a church annulment of the marriage. There was other evidence direct and circumstantial tending to show an absence of good faith on the part of defendant in seeking condonation, and there is no evidence tending to show that plaintiff would be free of the danger of renewed cruelty were she to return and live with defendant. Compare 1 Nelson, Divorce & Annulment (2d. ed.), section 4.31, pages 125 et seq.

The offer of condonation consisted of a series of letters written ▮ by defendant to plaintiff after she had left him. The record shows that defendant kept and retained copies of the letters. "Such conduct too clearly indicates the coldness and deliberation of the offer and its lack of good faith." 1 Nelson Divorce and Annulment (2d. ed.), section 4.32, page 128.

It was proper for the trier of the facts to conclude that letters sent under such circumstances are sent for the purpose of making evidence for the sender. Wilhelm v. Wilhelm, 130 Pa. Super. 143, 197 A. 496; McKee v. McKee, 107 N.J. Eq. 1, 151 A. 620; Popovics v. Popovics, 98 N.J. Eq. 350, 129 A. 126.

Likewise an offer of condonation is ineffectual where the ▮ conduct of the spouse making the offer has been such as to convince the trier of the facts that further cohabitation would be dangerous or intolerable or where the offer is not accompanied with reasonable assurances that the offer can be ac-

cepted with due regard to health, safety and comfort. 1 Nelson Divorce and Annulment (2d. ed.), section 4.36, page 134, and see Bovaird v. Bovaird, 78 Kan. 315, 96 Pac. 666; Slavinsky v. Slavinsky, 287 Mass. 28, 190 N.E. 826; Roy v. Roy, 47 R.I. 81, 129 A. 830; Csanyi v. Csanyi, 93 N.J. Eq. 11, 115 A. 76; Danielly v. Danielly, 93 N.J. Eq. 556, 118 A. 335.

The court stated the applicable rule in Wise v. Wise, 159 Md. 596, 152 A. 230, 231, where it said: "The determination of the question as to whether the appellant was wrong in her refusal to live again with the appellee depends on the kind and degree of mistreatment to which she was previously subjected. It was incumbent upon him to prove that the causes and circumstances of the separation were not such as to prevent his wife, with due regard to her safety, comfort and self-respect, from accepting his proposal for a reunion."

The proof did not satisfy the trial judge in this respect, and we cannot say that the trial court was in error in its conclusion that the wife was not guilty of desertion under R.C.M. 1947, section 21-112, as contended by defendant.

This case is not comparable to Giebler v. Giebler, 69 Mont. 347, 222 Pac. 436 and Clem v. Clem, 97 Mont. 570, 36 Pac. (2d) 1034, relied on by defendant. In those cases there was no cruelty involved. The parties had been living separate and apart by agreement and the cases were controlled by a different statute, R.C.M. 1947, section 21-111, reading: "Consent to a separation is a revocable act, and if one of the parties afterwards, in good faith, seeks a reconciliation and restoration, but the other refuses it, such refusal is desertion."

The next contention is that the court erred in awarding plaintiff $700 per month for her support. It is contended that the law favors reconciliation of the parties and that for the court to be as liberal as it was in the award for separate maintenance removes the incentive for reconciliation which the law favors. Boggs v. Boggs, 119 Mont. 540, 177 Pac. (2d) 869.

The question here is did the court make such an unreasonable award as to fall within the rule. In fixing the amount that

should be allowed to plaintiff the court should be governed by what is fair and reasonable having in mind the needs of the plaintiff, the financial ability of the defendant, the manner in which she has been accustomed to live and should leave an incentive for reconciliation rather than fix a premium for separation. 3 Nelson, Divorce & Annulment (2d. ed.), section 32.40, pages 410, 411.

In this case it is shown that defendant has considerable financial means. The parties were married only twenty-seven days until the separation took place. Plaintiff did nothing to help accumulate the financial resources now held by defendant. She offered proof that $700 is necessary for her support in New York City. However, she had not been accustomed to living in New York City. She had been receiving about $25 per week as wages in Ireland. She testified that a suitable apartment in New York City would cost her $300 per month. There was evidence that apartments were available at a cost of about $100 per month even in New York City. Other items which she claimed in making up the $700 per month were out of line with her accustomed mode of living.

We think in view of all the circumstances shown in the record, an award of $300 per month would be adequate for plaintiff's support and maintenance in the style and mode of living to which she has been accustomed, leaving separation neither attractive nor cohabitation a necessity.

Contention is likewise made that the award of attorneys' fees in the sum of $3,000 in addition to what had theretofore been paid was excessive. The amount theretofore ordered paid was $2,000. The court did not abuse its discretion in this regard. There was evidence from reputable attorneys that would have sustained a much larger award. The evidence on the point was conflicting. We sustain the order of the trial judge on this point.

The cause is remanded to the district court with direction to modify the order and judgment as to the award to plaintiff for support and maintenance in accordance with the views herein

310

stated and as thus modified the judgment and order will stand affirmed.

MR. CHIEF JUSTICE HARRISON and MR. JUSTICE CASTLES, concur.

MR. JUSTICE ADAIR, dissenting.

This is an appeal by the defendant, Frank Thomas Reynolds, from a decree granted the plaintiff, Patricia Josephine Reynolds, authorizing her to live separate and apart from her husband, requiring him to pay to her the sum of $700 a month for her support and maintenance, and decreeing that such judgment be a lien upon the husband's property.

The statute R.C.M. 1947, section 93-216, expressly provides that on appeal to it in matters and proceedings of an equitable nature, such as this, "the supreme court shall review all questions of fact arising upon the evidence presented in the record, * * * and determine the same, as well as questions of law, unless, for good cause, a new trial or the taking of further evidence in the court below be ordered * * *." Also, see, Sullivan v. Marsh, 124 Mont. 415, 420, 225 Pac. (2d) 868; Higby v. Hooper, 124 Mont. 331, 221 Pac. (2d) 1043; Hart v. Barron, 122 Mont. 350, 204 Pac. (2d) 797; Miller v. Miller, 121 Mont. 55, 190 Pac. (2d) 72; State ex rel. Nagle v. Naughton, 103 Mont. 306, 63 Pac. (2d) 123. Such has been the duty of the supreme court of Montana on appeals, such as this, at all times since the enactment, in 1903, of the "Fair Trial Laws" by the Second Extraordinary Session of the Montana Legislature held in December 1903. See chapter 1, at pages 7 and 8, Laws of Second Extraordinary Session Laws of the Eighth Legislative Assembly of 1903.

The rule that the trial court may not disregard uncontroverted credible evidence is fundamental. See Higby v. Hooper, supra, and cases therein cited.

In compliance with the above-quoted mandate of section 93-216, supra, we have carefully read and reviewed all the testi-

mony and other evidence in the record on this appeal, and find
that much material and credible testimony elicited from the
defendant husband and his witnesses stands uncontroverted and
also that the inherent improbability of much of the plaintiff's
uncorroborated story is such as to seriously tax our credulity.
We, too, shall not here set out all the lurid details of the story
eagerly related by Patricia from the witness stand for the rea-
son that they are so revolting and disgusting that they would
serve only to offend the sensibilities of those who read our
opinions, for as was well said by Chief Justice Brantly in his
opinion in the case of State v. McIlwain, 60 Mont. 598, 201 Pac.
270: "* * * taken as a whole, the story is * * * so
wholly unworthy of credit that, standing alone, it ought not to
be accepted as true by any reasonable person."

Frank Thomas Reynolds is a long-time resident of Glendive,
Montana. There for almost half a century he has lived and
worked. There he has successfully operated an extensive and
profitable retail grocery business. There he owned and main-
tained a comfortable home wherein he housed and reared four
sons and two daughters and provided for their mother so long
as she lived.

In the early part of 1952 Mr. Reynolds' helpmate and the
mother of his children passed away. Following this event Mr.
Reynolds set out on a trip to Europe as his health had become
considerably impaired. For some six years previous he had
been suffering from diabetes in the treatment whereof he was
required to use insulin.

One morning about the first of June, 1952, while on his trip,
Mr. Reynolds entered a small drug store in the city of Dublin,
in the Republic of Ireland, to purchase a bottle of insulin. The
proprietress, a Mrs. Ward, attended to his wants and then pre-
sented him to her store clerk or sales assistant, Patricia Jose-
phine, then a spinster, 34 years old.

At that time he and Patricia conversed in the store for about
an hour and then Patricia invited Frank to meet her again at

one o'clock that afternoon to accompany her to her home to meet her mother and to have noonday lunch with them.

Frank accepted Patricia's invitation. He met her at the bus stop at the appointed time. He accompanied her to her home. He met her mother. He ate of the lunch and he spent the afternoon with Patricia, during which time they discussed the past history as well as the present and future plans of each. That evening they attended a theater located in the vicinity of Patricia's home.

During the course of this, their first evening together, Patricia told Frank he was "so kind and gentle." She told him he was "the kindest hearted man" she had ever met and that she was in love with him. Apparently such talk fell not upon deaf ears for on the following forenoon Frank again presented himself at the drugstore where he continued talking to Patricia about himself.

Such is but the ordinary and usual behavior of the male of the genus *Homo* for as Kipling well said: "The first proof a man gives of his interest in a woman is by talking to her about his own sweet self. If the woman listens without yawning, he begins to like her. If she flatters the animal's vanity, he ends by adoring her." See Baird v. Baird, 125 Mont. 122 at page 139, 232 Pac. (2d) 348 at page 357.

Be that as it may, during his talk with Patricia on this his second and last visit to the drugstore where Patricia was then employed at a wage equivalent to approximately $25 per week, she, according to Frank, sought and obtained his permission to correspond with him when he returned to America "with the object in view of a possible marriage." On that same day Frank left Dublin and returned to the United States and to his home in Glendive, Montana.

Thereafter Frank and Patricia saw nothing further of each other until the first part of November, 1953. However, from the month of June, 1952, to the month of November, 1953, the two carried on a correspondence in the course of which it was finally arranged that they would meet in New York City in

November, 1953, for the purpose of becoming married and this they did, the trip being Patricia's first to America.

At the time of the marriage which occurred on November 15, 1953, Frank was 65 or 66 years of age, five feet, six and one-half inches tall and weighed 133 pounds and Patricia was 35 years of age, five feet, eight and one-half inches tall and weighed "in the neighborhood of 172 or 174 pounds."

On the evening of their marriage, November 15, the couple left New York City by train and on the evening of November 17, 1953, they arrived at Glendive, Montana. Immediately upon leaving the train they were taken to the home of Frank's son-in-law and daughter, Mr. and Mrs. McGovern, where they resided until December 12, 1953.

The McGovern home, commonly known as "the Hollecker House," had long been occupied by Frank. It was a large two-story house with four comfortable bedrooms and a bathroom all located on the second floor. Mr. and Mrs. McGovern slept in the front bedroom, their two children slept in an adjoining bedroom and Frank and Patricia occupied a third bedroom across the hall and directly opposite the bathroom. This was intended only as a temporary residence for the couple pending the vacating and reconditioning of a five-room apartment in a two-story apartment building known as "the Dion House" owned by Frank and situate quite near the McGovern home.

On November 18, the day following her arrival in Glendive, Patricia accompanied Frank to the F. T. Reynolds Grocery Store which he then owned and operated. There he introduced his new wife to the employees of the store, to his friends and to the store's various customers as they came in. During the ensuing twenty-four days which she spent in Glendive, Patricia at all times was free to come and go as she pleased. Occasionally she worked a few hours at the grocery store filing sales slips and making out daily report slips. She also assisted with some housework at the McGovern home, such as making up her bed, dusting her bedroom, and at times helping with the washing of the dishes.

On the evening of December 12, 1953, without the consent and wholly without the knowledge of Frank, Patricia left Glendive by train for New York City with the intention of there permanently living separate and apart from her husband. Immediately upon learning of her departure Frank dispatched a telegram to be delivered to Patricia on the train en route to or at Chicago, asking that she return to Glendive. Patricia did not answer the telegram. Thereafter, during the months of December, 1953, and January and February of 1954, Frank wrote Patricia some thirteen letters soliciting condonation and offering to fulfill the marriage contract. None of the letters were answered. Patricia testified that she did not answer any of these letters and further that she did not even open some of them.

In the meantime Frank kept the apartment in readiness for Patricia should she be prevailed upon to return to Glendive, and he sent her money for travel expenses from New York City to Glendive, Montana. It would appear that he did about everything that possibly could have been done to induce his spouse to return to his home and there live with him as his wife. He testified that he advised Patricia that he would purchase her a new car in the spring of 1954; that he would take her on a honeymoon trip to Nevada or Southern California after the first of the year, 1954 and that during the following summer he would take her back to Ireland for a visit.

There was also evidence that Frank had agreed to make Patricia the beneficiary of his life insurance and that he offered to place the title to the apartment house known as "the Dion House" in Patricia and himself as joint tenants with right of survivorship.

In the short space of but twenty-five days from November 17 to December 12, 1953, which covers the entire period of time that Patricia lived in Glendive, Frank had little opportunity to do for her all the things which she desired and demanded done.

On her cross-examination Patricia testified:

"Q. Now, you were with Mr. Reynolds as his wife I take it from your testimony from the 15th of November until the 12th

of December? A. That's true. Q. And that is the only time you have lived as man and wife? A. Yes. Q. Do you think that that period of time was a long enough period of time for you and Mr. Reynolds to adjust yourselves one to the other? * * * A. *I considered it was more than enough time to give him to see if he would come through with any of his promises.*''

''After marriage arrives a reaction, sometimes a big, sometimes a little, one; but it comes sooner or later, and must be tided over by both parties if they desire the rest of their lives to go with the current.'' Kipling. See Baird v. Baird, 125 Mont. 122, 138, 232 Pac. (2d) 348.

Here the reaction commenced to manifest itself on the wedding night and twenty-seven days later it had arrived whereupon the wife voluntarily quit her husband, left his home in Glendive, took a train for New York City, rejected all her husband's solicitations of condonation and then instituted and prosecuted against him this suit for separate maintenance.

It is quite apparent that this man and woman did not and they could not adjust themselves to the new status which they had assumed within the brief space of but twenty-seven days, and the wife, by quitting her spouse and running away, made attempts at reconciliation most difficult, and if not utterly impossible, at least completely unfruitful.

In 1 Schouler, Marriage, Divorce, Separation and Domestic Relations (6th ed.), section 23, page 36, it is said:

''As to fraud, in order to vitiate a marriage, it should go to the very essence of the contract. But what constitutes this essence? The marriage relation is not to be disturbed for trifles, nor can the cumbrous machinery of the courts be brought to bear upon impalpable things. The law, it has been well observed, makes no provision for the relief of a blind credulity, however it may have been produced. Fraudulent misrepresentations of one party as to birth, social position, fortune, good health, and temperament, cannot therefore vitiate the contract. *Caveat emptor* is the harsh but necessary maxim of the law.

Love, however indispensable in an aesthetic sense, is by no means a legal essential to marriage; simply because it cannot be weighed in the scales of justice. So, too, all such matters are peculiarly within the knowledge of the parties themselves, and they are put upon reasonable inquiry."

Nothing could be more dangerous than to allow those who have publicly and solemnly agreed to take each other, in terms *for better, for worse,* to be permitted to say that one of the parties is worse than expected. Long v. Long, 77 N.C. 304, 308, 24 Am. Rep. 449.

In Schaeffer v. Schaeffer, 160 App. Div. 48, 144 N.Y.S. 774, it is said:

"* * * we have not yet arrived at a legal stage which requires an annulment of a marriage because one party or both parties were untruthful to each other in their mutual protestations of all-consuming an undying love. Marriage is yet a status, on which depends the idea of a family, and on which in turn has arisen the structure of civilization as we know it."

Marriage is something more than a mere "share the wealth" arrangement and the relation should not be considered nor allowed to become a license to loot the estate or wrongfully demand, seize and acquire the property of either spouse. See our dissenting opinion in Detert v. Detert, 115 Mont. 313, 346, 142 Pac (2d) 215, 229.

In 1 Bishop, Marriage and Divorce (5th ed.), sections 167, 168, pages 143, 144, it is said that in the contract of marriage "the parties take each other for better, for worse, for richer, for poorer, to cherish each other in sickness and in health; consequently a mistake, whether resulting from accident or indeed generally from fraudulent practices, in respect to the character, fortune, health, or the like, does not render void what is done. * * *

"If the man should in words agree with the woman to be her husband only on condition of her proving so rich, so virtuous, so wise, so healthy, of such a standing in society; yet, if he afterward celebrates the nuptials on her representing herself to pos-

sess the stipulated qualities, while in truth she is destitute of them; still, in such celebration, he says to her in effect and in law, 'I take you to be my wife, whether you have the qualities or not, whether you have deceived me or not'. In other words, he waives the condition. To carry such a condition into the marital relation would violate its spirit and purpose, and be contrary to good morals. The objects of marriage, rightly understood, transcend all considerations of the kind mentioned; * * * surely the husband should not be permitted to repudiate his marriage, though he should discover an absence of some secondary thing, to which he had given his affections, instead of placing them where he had promised.'' The text then states that any other rule ''would degrade a high and holy relation to a level with things of mere mercantile consideration.''

The evidence introduced by Patricia in support of her complaint in this action, other than her own testimony, consisted of one letter introduced as an exhibit; the testimony of Irma Jacobson, a beauty operator residing in Glendive; the testimony of plaintiff's first cousin, John R. Baker, residing in Long Island, New York, and the separate depositions of two doctors residing and engaged in practice in New York City. Such other witnesses as took the stand in Patricia's behalf merely testified as to the amount and reasonableness of the costs and attorney fees claimed by plaintiff.

In her testimony Patricia charged Frank with having inflicted upon her physical and mental cruelty with threats to her life and body, with unnatural and inhuman treatment, with the use of abusive and vile language, and with the failure to keep the promises she claims he made to her to bestow upon her a considerable portion of his worldly goods. Such testimony is not corroborated by the testimony of any other witness. The proof of the charges made is entirely dependent upon Patricia's veracity.

It appears however, that Patricia's veracity has been seriously challenged and that the testimony which she gave was and is contradicted by various witnesses who testified on behalf of the

defendant husband and who, under oath, flatly and repeatedly denied Patricia's charges and the testimony given by her in support thereof. The rule to be here applied is that stated in Casey v. Northern Pacific Ry. Co., 60 Mont. 56, 68, 198 Pac. 141, 145, viz.: "The rule has been stated repeatedly in this jurisdiction that a court may reject the most positive testimony, though the witness be not discredited by direct evidence impeaching him or contradicting his statements. The inherent improbability of his story may deny it all claims to respect. [Citing cases]. The credulity of courts is not to be deemed commensurate with the facility or vehemence with which a witness swears. 'It is a wild conceit that any court of justice is bound by mere swearing. It is swearing creditably that is to conclude its judgment'. [Citing cases]."

Irma Jacobson, called as a witness on behalf of the plaintiff, testified that on one occasion Patricia had an appointment with the witness at which time Patricia showed the witness one small bruise or discoloration on plaintiff's right leg; that Patricia at that time appeared to be depressed; that she was crying; that at the request of Patricia the witness addressed and mailed a letter for her; that on such occasion Patricia appeared to be worried and downhearted and stated that she wanted to leave Glendive. However, the witness Irma Jacobson knew and she testified to nothing concerning any of Patricia's alleged marital troubles nor had Patricia discussed them with the witness.

John R. Baker, called as a witness for the plaintiff, testified that he owns and operates a taxi cab in New York City; that he was not acquainted with Patricia, who is his first cousin, until November 1, 1953, on which date she arrived in New York City from Ireland. He further testified that based upon the observations he made of her in the two weeks preceding her marriage and in the time he had seen her subsequent to her return to New York from Glendive, he would say that since her return to New York she appeared to be nervous and excited and that she partook but sparingly of her food. However this witness knew

nothing and he testified to nothing concerning the treatment accorded Patricia by her husband.

The plaintiff's witness, Dr. Berry was never consulted by Patricia until after her return to New York from Glendive. In his deposition Dr. Berry testified that he made no physical examination of Patricia; that when she consulted him she appeared nervous and uncooperative; that he prescribed for her a sedative, to-wit, phenobarbital, and that he then advised her to get another doctor. Such deposition fails to corroborate in any manner Patricia's charges against her husband or her own testimony in support thereof.

The plaintiff's witness Dr. Foxe likewise was never consulted by Patricia until after her return to New York from Glendive. In his deposition Dr. Foxe testified that he specialized in psychiatry; that at no time did he make any physical examination of Patricia; that he treated her only with psychotherapy, reassurance and other pyschiatric treatment given her as a result of and based upon such information as Patricia herself had given him and that during the period from January 26, 1954, to April, 1954, he gave Patricia psychiatric treatments of one hour each on twenty-two separate occasions. The deposition of Dr. Foxe fails to corroborate Patricia's charges against her husband in anywise or manner.

From the depositions of both Doctors Berry and Foxe it would appear Patricia was and is mentally sick, highly nervous and an easily upset person. With these facts before the court this ailing woman's charges, complaints and testimony must be carefully and cautiously scrutinized.

At the trial Patricia testified that after she had left Glendive and returned to New York, she consulted one Dr. Wallace, then a practicing physician in New York City, who gave her a physical examination, took some blood tests, made some X-ray pictures of her back, and then informed her that her spine was crooked and injured. However it appears from the record that Dr. Wallace had died prior to the trial of this action and that he left no deposition or other written record or report of his findings that

in anywise or manner would tend to corroborate Patricia's testimony.

On the other hand, the testimony given by the defendant, Frank Reynolds, denying Patricia's charges against him is corroborated by numerous witnesses who testified in his behalf and who had had personal contact with, and who were in a position to observe, the two newlyweds during Patricia's brief stay in Glendive.

Patricia testified that her marriage with Frank had been fully consummated. She testified that beginning with the wedding night, November 15, 1953, she and Frank indulged in acts of sexual intercourse each and every night to and including December 10, 1953. This testimony was and is emphatically denied in its entirety by Frank who testified that the marriage had never been consummated.

Edwin S. Haskell, a resident of Glendive for more than fifty-six years, at one time cashier of the Exchange Bank in Glendive and presently engaged in the insurance business, was called and testified at the trial as a witness on behalf of the defendant. Mr. Haskell testified that he resided within one-half block of the home in Glendive where Frank and Patricia resided; that he had been introduced to Patricia; that he frequently saw her; that during the first part of December, 1953, he had a conversation with Patricia near the First National Bank building in Glendive. When asked to relate such conversation the witness, Haskell, on his direct examination testified:

"A. Well, I met her on the corner there, and she was crossing the street, and I thought she looked pretty down in the mouth, and I said to her, 'What is the matter with you today?' 'Well,' she said, 'everything'. 'Well,' I said, 'what happened?' 'Well,' she said, 'I am awfully disappointed in everything I found here'. She said, 'I was promised to be queen in my mansion', and she said, 'I was promised a Cadillac car, and we would tour the country and none of it has transpired', and she said, 'I am living in a house with Mr. Reynold's daughter in one room.'
* * *

"Q. Did you say anything to her? A. Did I say anything to her?

"Q. Yes. A. Yes, I said something to her.

"Q. What did you say to her, Mr. Haskell? A. Well, I said, 'You told me all of your troubles, and now we both are married, could I ask you something?' and she said, 'What is it?' and I said, 'Does sex have anything to do with it?' I said, 'I know Frank is an old man and you are a young woman and I know enough about life to know that those things cause trouble,' and she said, 'We have never had intercourse'.

"Q. Never had intercourse? A. Never had intercourse.

"Q. Did she say anything about leaving Glendive at that time? A. She said, 'I can't stay here'."

The record shows that Mr. O'Neil, of counsel for plaintiff, concluded his cross-examination of the witness Haskell as follows: "Q. And you are much interested in the outcome, aren't you? A. Well, I don't want—Q. You can say yes or no, Mr. Haskell. A. Yes, I am. Mr. O'Neil: That's all."

The record also shows that thereafter on his redirect examination by defendant's counsel the witness Haskell, in part, testified: "Q. Why are you interested in the outcome, Mr. Haskell? A. Well, I hate to see anybody gyped, and I think Mr. Reynolds is certainly getting gyped."

Thereafter the witness Haskell was subject to the following recross-examination by attorney O'Neil, viz.:

"Q. Do you know anything about the personal treatment this defendant gave the plaintiff his wife? A. No, I do not.

"Q. Then you don't know whether he is getting gyped or not, do you? A. In my own mind I think he is.

"Q. That is your conclusion? A. Yes.

"Q. You don't know anything about the facts of the case? A. No, I don't.

"Q. I never gave you any of them, did I? A. In a way you did, yes.

"Q. Not as to the details? A. Well, I told you that I understood it was going to be settled out of court and what I had been

told that she was asking, and you said that no such amount at all as that, *its* been cut way below that.

"Q. I told you, did I not, Mr. Haskell, that that was not the offer made. That is all I said, wasn't it? A. No. You said it had been cut way below that.

"Q. That was at a separate conversation, was it not? A. I don't know when, but you told me that.

"Q. I told you what you said was not correct and that is all I said, wasn't it? A. No, I don't think so.

"Q. Your memory is very faulting, isn't it? A. No. I am an old man, but my God I can remember something.

"The Court: Do not use profanity in my courtroom, sir.

"The Witness: I beg your pardon.

"The Court: I will fine you before you leave that stand. You will be in contempt.

Mr. O'Neill: That's all.

"The Court: You may step down."

At the trial Frank testified that in absolute good faith, he had solicited condonation from Patricia by and in the telegram sent her on the night of December 12, 1953, while she was en route to New York, and by and in the various letters which he had written and caused to be delivered to her in New York after her arrival there. Furthermore it stands uncontroverted that Frank kept the newly reconditioned apartment in "the Dion House" vacant and in readiness for immediate occupancy awaiting Patricia's return. I am not persuaded that there is sufficient credible evidence in the record to sustain the trial court's finding to the effect that Frank was not acting in good faith in his repeated solicitations of condonation. How could his good faith be tested or proven other than by affording him the opportunity to perform and by such means establish the sincerity of his purpose? As was said by this court in Bordeaux v. Bordeaux, 43 Mont. 102, 117, 115 Pac. 25, 31: "There is nothing in the evidence reflecting upon the real motive, other than plaintiff's declaration that he extended the invitation with the intention that defendant should accept it, and her declaration that she did not accept it,

because she did not regard it as made in good faith. * * * But he expressed a willingness for a reconciliation, offered to furnish her a home, to resume cohabitation, and to discharge his duties under the law. * * * She could easily have tested his sincerity by accepting his overtures, and had he then refused to receive her or thereafter proved derelict, her rights as his lawful wife would not have been prejudiced. But she could not capriciously refuse to accept his offer, because it was not couched in the terms which she would have dictated or preferred. * * * He was not bound to go further and seek a personal interview or concede the extravagant demand made by her that he should put at her disposal his entire income, besides paying over in cash a large sum of money to furnish a home other than the one which he, as the head of the family, had a right to choose, and which, so far as the evidence shows, was reasonably suitable and within the compass of his income. Upon the face of it, his offer of reconciliation was made in good faith." In the Bordeaux case, supra, there was a rejection or conditional rejection of the offer, whereas in the present case there was silence on the part of Patricia which, in the eyes of the law, amounts to a rejection by her of the offers.

It is the policy of the law that the "door of repentance and return" must be kept open. In Boggs v. Boggs, 119 Mont. 540, 546, 177 Pac. (2d) 869, 872, this court said: "The law favors the reconciliation of the parties, and it should not be construed so as to afford a temptation for the wife to press an action for maintenance rather than to seek restoration to her marital rights."

R.C.M. 1947, section 21-112 provides: "If one party deserts the other, and before the expiration of the statutory period required to make the desertion a cause of divorce, returns and offers in good faith to fulfill the marriage contract, and solicits condonation, the desertion is cured. If the other party refuse such offer and condonation, the refusal shall be deemed and treated as desertion by such party from the time of refusal."

In Appleton v. Appleton, 97 Wash. 199, 166 Pac. 61, it is said:

"The question then is, When a wife, living separate and apart from her husband because of his fault, deliberately refuses to return to him when, repenting of his error he seeks reconciliation and requests her return, does such refusal constitute abandonment if continued in for the statutory period of one year? We think it does. [Citing cases].

"The good faith of the appellant's offer is a question of fact which can only be determined upon hearing. Musgrave v. Musgrave, 185 Pa. 260, 39 A. 961. The law is inclined to encourage reconciliations and the resumption of the marital relation between estranged spouses. In enforcing this rule it has been held that not only will the refusal of a good faith offer to resume the broken relation put the refusing party in actionable default, but that it will defeat the enforcement of orders and decrees of separate maintenance. [Citing authorities]."

When Patricia became married to Frank she was required by the law of Montana to conform to his choice of any reasonable place or mode of living. R.C.M. 1947, section 21-113, expressly provides: "The husband may choose any reasonable place or mode of living, and if the wife does not conform thereto, it is desertion."

Clearly Frank's choice of both place and mode of living was reasonable. He took his bride to the large two-story "Hollecker House" in Glendive where he and his family had lived for years and where, following the death of the mother of his children, Frank had continued to reside with his daughter, Mrs. Rita McGovern, her husband and their children. Frank intended, and he so informed Patricia, that the "Hollecker House" was merely a temporary home for the couple until such time as they could arrange for the tenants, then occupying a five-room apartment in the "Dion House," to vacate so that Patricia and Frank could move in.

The evidence shows that while Frank was in the process of providing the apartment in the "Dion House" which house the couple would have owned jointly, and while he was making such apartment ready for their occupancy that Patricia refused to

longer live with him; that she left him and his home on December 12, 1953, and that as she frankly admitted on the witness stand, she did not intend to and she would not live in Glendive, but that she desired to live in New York City and have Frank supply her with sufficient money to enable her to live in the vicinity of Park Avenue where, according to her testimony, an apartment suitable to her needs would cost three hundred dollars per month.

There is considerable evidence tending to show that as early as the night of the wedding, Patricia made manifest and began to execute a plan and scheme for avoiding her marital obligations, and that she continued in the execution of such plan to the time of her departure from Glendive some twenty-seven days later.

In my opinion there is insufficient evidence to establish that Patricia entered into the marriage in good faith or for the legitimate and honorable purposes for which the institution of marriage exists. Nevertheless by its decree the trial court has hung a millstone about the husband's neck, and relieved the woman, who became a wife in name only for but twenty-seven days, from the duty of ever performing any of the obligations required of her by both the marital contract and by the law. At no time while the decree stands and while Patricia is maintained and lives in New York separate and apart from her husband will she be in a position to perform any of the obligations of her marriage contract.

James Felt, a witness for the defendant husband, testified that on December 6, 1953, in Glendive, being but six days before Patricia left her husband that she complained to the witness that Frank was "mean and stingy"; that he failed to keep the promises he had made with respect to their living accommodations and regarding his money and property; that after making such charges Patricia stated to Mr. Felt that she was willing to forget about those matters if Frank would name her beneficiary of his life insurance and would convey to her one-half

interest in his apartment building, referring to the "Dion House" above-mentioned.

The witness Felt further testified that Frank then agreed that within six months or less he would name Patricia as beneficiary of his life insurance and convey to her one-half interest in the apartment building, and that thereupon Patricia "threw her arms around Frank's neck and kissed him, and said 'I love you, Frank. I know we can be happy here. I want our marriage to be completely successful'." In her rebuttal Patricia did not deny having the above conversation with the witness Felt other than she did deny that she threw her arms around Frank and kissed him, and she also denied that she had then or there said to Frank, "I believe our marriage will be a success."

In my opinion there is insufficient credible evidence to sustain the trial court's findings of mental and physical cruelty inflicted upon plaintiff by the defendant, or to sustain the trial court's findings that Frank's repeated solicitations of condonation were not made in good faith.

As was said by Chief Justice Pemberton in State v. McMillan, 20 Mont. 407, 412, 51 Pac. 827, 828: "When the testimony is flatly and positively contradicted, there may be said to be a conflict in the evidence. But when the testimony is not only flatly contradicted, but appears to be so unnatural, improbable, and unreasonable as to render belief impossible, it is more than a simple conflict, and must necessarily leave in the mind of an impartial, deliberate, and intelligent person a reasonable doubt."

Twenty-seven days most certainly was far too short a time for these two comparative strangers to become adjusted to each other and to achieve harmony in their new status. Patricia walked out on Frank without even attempting to iron out the difficulties of which she here complains. She left him without even bidding him goodbye. At the very least the law requires that she must show that she has made an attempt in good faith, to properly perform her obligations under the marital contract. Such evidence is lacking in the record before us.

In her complaint, as amended, filed June 26, 1954, the plain-

tiff Patricia prayed that the trial court adjudge: That she may live separate and apart from the defendant; that the trial court make an order directing the defendant to pay to the plaintiff $1,500 a month for her support and maintenance pending the outcome of the action and the sum of $10,000 to enable plaintiff to employ counsel to prosecute the action and the sum of $1,075 with which "to enable the plaintiff to pay $500 in medical bills which she has incurred since she left the defendant and the amount of $575 which she has been forced to borrow from relatives and friends in order to provide herself with the common necessities of life during the time she has lived apart from the defendant and a reasonable sum for costs and expenses to prosecute this action."

On July 15, 1954, by order that day made, the trial court ordered and required that the defendant husband pay to the plaintiff wife during the pendency of this action: The sum of $500 before the 19th of July 1954; the further sum of $500 before the 26th day of July 1954; and the sum of $500 on or before the 26th day of each succeeding month thereafter until further order of the court; the further sum of $750 for dental and doctor bills contracted by plaintiff subsequent to her marriage; the further sum of $100 for costs in the prosecution of the action and the sum of $1,000 as attorneys' fees.

On January 4, 1955, by order that day made the trial court ordered and required that the defendant husband pay to the plaintiff the sum of $1,000 as attorneys' fees in addition to the sum theretofore ordered and also to pay the plaintiff the sum of $350 for costs in prosecuting the action in addition to the amount theretofore ordered.

On June 20, 1955, by order that day made the trial court ordered that the defendant husband pay to the plaintiff the sum of $400 as and for additional costs in prosecuting the action and the further sum of $3,000 as and for additional attorneys' fees.

On June 21, 1955, by decree and judgment that day made and entered the trial court adjudged and ordered: That the plaintiff will be authorized to live separately and apart from the de-

fendant; that the defendant husband pay to the plaintiff for her support and maintenance the sum of $700 each month commencing on the 28th day of June, 1955, and a like sum on the 28th day of each month thereafter until further order of the court and that such judgment be a lien upon the separate property of the defendant, Frank Thomas Reynolds.

Apparently the above is but a portion of the costs to Frank Reynolds of twenty-seven days of wedded bliss.

In my opinion the judgment is contrary to both the credible evidence submitted and the law and for such reason it should be reversed.

MR. JUSTICE BOTTOMLY:

I concur in the above dissenting opinion by Mr. Justice Adair.